**526 P.2d 1252**

**Marcia M. ATKINSON, a single woman, Appellant,**

**v.**

**VALLEY NATIONAL BANK OF ARIZONA, a national banking association, Appellee.**

**No. 1 CA–CIV 2271.**

Court of Appeals of Arizona, Division 1.

Oct. 10, 1974.

Rehearing Denied Nov. 22, 1974.

Review Denied Jan. 8, 1975.

---

———◆———

Christakis & Rodarte, by Charles Christakis and Sev A. Rodarte, Phoenix, for appellant.

Rawlins, Ellis, Burrus & Kiewit, by Edward O. Burke, Phoenix, for appellee.

## OPINION

HOWARD, Judge.

This appeal from a judgment dismissing appellant's complaint and in favor of appellee on its counterclaim (pursuant to the court's direction of a verdict), presents this court with a fact situation rivaling the complexity of the Gordian Knot; yet by resorting to normal rules of contract law, the intricacies may be unravelled. When the strands are organized, affirmance is warranted.

The original complaint alleged that appellee had wrongfully converted appellant's bank account. Appellee answered and counterclaimed to recover the amount allegedly due on a note held to secure a loan to appellant. Unbeknown to appellee and appellant, the paths which led to their financial conflict began in 1958. Appellant is a naturalized American citizen from Czechoslovakia. Her surname was Zelznak. In 1958 she met John Atkinson (hereinafter John) in Niagara Falls, New York. For about six years she lived with John. It was at this time that she took the name Atkinson. During this period of cohabitation they never went through a marriage ceremony, however, they did travel

to and live in at least one state which recognizes common law marriages, Texas. Throughout the proceedings, appellant denied that she was ever John's wife.

In 1964, appellant moved to Arizona, while John remained in New York. She did not hear from John until July of 1971. During the interim, she was employed and secured several loans from appellee. On the loan applications her marital status was described as having been "separated from John". All of these loans were paid off. In July, 1971, John came to Arizona and sought appellant's assistance in securing a loan to purchase a truck-tractor. John planned to lease the truck-tractor to King Van Lines, and, once the loan payments were taken care of, they planned to split the profits. On the morning of July 30, 1971, the pair went to appellee's Mesa Westside branch to negotiate a loan. They conferred with Neil McConahay (hereinafter referred to as McConahay) who filled out their loan application. The loan was not immediately granted. John and appellant were told that appellee would inform them whether their loan was approved.

Unable to wait for word from appellee, appellant, at John's urging, telephoned McConahay that afternoon. He advised them that their loan had been approved but that appellant would have to pledge her savings account as security. She and John then went to appellee's office. A monthly installment note was drawn up by which the loan of $5,916.55 ($5,720 was to cover the cost of the truck and the tax thereon. $196.55 was to cover the cost of insurance.) was to be paid off in twenty-four payments of $273. The note was signed by John A. Atkinson, as borrower, and Marcia M. Atkinson, as wife, and provided that "the makers, endorsers and guarantors hereof jointly and severally promised to pay" in the event of a default.

At trial, appellant testified that McConahay instructed her where to sign. A federal Truth in Lending Disclosure Statement was signed by John and appellant.

The heading on the statement read, "John A. Atkinson and Marcia M. Atkinson, husband and wife". Appellant testified that she signed the statement without reading what it said. Finally, a security agreement was drawn up in which appellant's savings account with appellee was pledged as security. The consideration for the agreement was stated as "one or more loans or credit accommodations granted to undersigned (Debtor)". Two cashier's checks were issued in the amount of $5,500 and $220. According to appellant's testimony, McConahay was directed by her to issue the cashier's checks in both her and John's names. The formalities completed and the money paid, John and appellant left the bank. They returned to appellant's house and she left for her evening job. She did not sign the cashier's checks.

John attempted to purchase the truck-tractor using the cashier's checks, but the dealer refused to accept the checks because appellant had not endorsed them. John hurriedly called McConahay, and McConahay told him that he would keep the office open just to accommodate him. John arrived at about 6:00 p. m. and asked McConahay if he would change the cashier's checks so that only his name would appear on them. McConahay took back the previously issued checks and gave John two other cashier's checks in the same denominations payable to John A. Atkinson. With these checks, John purchased the truck-tractor.

When appellant returned from her job and saw the rig parked in front of her house, she asked John how he purchased it since she had not signed the checks. John told her not to worry about it, "you're not obligated, I financed the tractor". Six days thereafter, John left Arizona and only returned for a short period in November, 1971.

Several days after the second set of cashier's checks was issued appellee filled out portions of the installment note for its loan file. At the top of the note, appellee typed the account number and the name

"ATKINSON, JOHN A." Appellant's name was not typed on the note for file purposes. Appellee mailed a loan payment book to John at appellant's address. Appellant's name did not appear anywhere on the book. On August 16, 1971, appellee refunded $8.89 because of a reduction in the insurance rates. The refund check was made out to John Atkinson and mailed to appellant. After receipt of the check John telephoned appellant. She told John about the check and asked whether he wanted her to forward it. He told her to endorse it and deposit it in her checking account, which she did. Appellant did not contact appellee regarding the loan until the early part of September, 1971. At that time, appellant learned that the truck-tractor had been reported stolen. Because she felt that the appellee had a lien on the vehicle in connection with the loan, appellant telephoned McConahay. McConahay told her that they were not concerned because her savings account was security for the loan. After this telephone conversation appellant went to appellee's Westside branch. Appellant's testimony regarding her meeting with McConahay was as follows:

"Q. Now, did he tell you anything about what would happen if the payments weren't made?

A. Yes.

Q. What did he say?

A. He said if John didn't meet his payments within three months, they would just take the full amount out of my savings account.

Q. And then what did you say?

A. I told them I'd look into it further. And I made a payment on that tractor truck because I did not trust them any further.

Q. And how did you make they payment?

A. He had shown me how to fill it out, withdrawal slip, and they would record it in the bank card."

In all, appellant made such payments in September, October, November, December and January. Shortly after her confrontation with McConahay, appellant contacted an attorney and authorized the attorney to receive all information held by appellee regarding the loan. She discharged that attorney in October because he was too busy to handle her problems. Thereafter, she contacted her present attorney and suit was filed on January 27, 1972, because appellee would not release the funds in her savings account to her.

By claiming that appellee converted her savings account, appellant is contending that it is wrongfully depriving her of her property. United Bonding Ins. Co. v. Swartz, 12 Ariz.App. 197, 469 P.2d 89 (1970). The deprivation is due to the security agreement which pledged her savings account in consideration of the loan. The deprivation is only wrongful if her obligation under the security agreement has been discharged.

We believe that the major issue of this appeal may be resolved by answering two questions: Did appellant receive consideration for her promise to repay the loan; did the issuance of the second set of cashier's checks constitute a material breach of the loan contract?

The consideration that appellant received from the loan contract stems from the fact that either appellant was married to John or she was estopped from denying her marital status. We feel that the evidence warrants the conclusion that appellant and John were legally married. For some time, they cohabited in Texas, a state which recognizes common law marriages, and used the same surname. This appears to be sufficient to establish a valid marriage.

"In the case of Consolidated Underwriters v. Kelly, Tex.Com.App., 15 S.W. 2d 229, 230, it was held that an agreement to live as man and wife will be implied where the circumstances of co-habitation and holding out as husband and wife warranted. . . . 'Proof that a couple live together under the same name, introducing each other as husband

and wife, respectively, recognizing their children, and the many other respects tending to show their marital status, is sufficient to prove a marriage. It is not necessary . . . to offer evidence . . . of the actual agreement of the parties to be husband and wife.' " Smith v. White, 216 S.W.2d 672, 674 (Tex.Civ. App.1948).

Absent a showing of intent to evade Arizona statutes, a marriage valid in another state will be recognized in Arizona. We are confronted, therefore, with a situation in which a debt is incurred during coverture.

"In situations involving a contract debt or other contractual obligation, it is well established by many Arizona decisions that if such debt or contractual obligation was incurred during coverture, it is presumed to be a community debt." Garrett v. Shannon, 13 Ariz.App. 332, 333, 476 P.2d 538, 539 (1970).

■ Through the security agreement, appellant pledged what may well have been her separate property as security for the community debt. Likewise, the truck-tractor purchased with the borrowed money was a community asset having been acquired during coverture. As a community asset, appellant received a half interest in it and thus received consideration under the loan contract. Even if appellant were not married, her actions in negotiating the loan irrefutably estopped her from denying her status.

■ Since there was a valid contract, appellant could only be relieved of liability thereunder if there were a material breach of the contract. It is claimed that the issuance of the second set of cashier's checks establishes such a breach. To weigh the validity of this claim, it is necessary to recognize that the loan contract was the written installment note. Its terms are unambiguous and cannot be contradicted by parol evidence. Had the note incorporated the desire to grant appellant the powers she received through the issuance of the first set of cashier's checks, then the revocation of those powers through the issuance of the second set would have been a breach of the agreement. Yet an examination of the installment note discloses no such provision. Rather, appellant signed the note as John's wife, and, by operation of law, John was given managerial control over its proceeds. Therefore, there was no breach of the agreement.

■ At the trial, the jury returned an award of $1,700 in attorneys' fees on appellee's behalf. Appellee argues that this award was justified by the terms of the security agreement and requests that this court grant it reasonable attorneys' fees incurred by it in furtherance of this appeal. Appellant fears that "[i]f appellee's reasoning is followed, then they would be entitled to perform any wrongful invasion of any security interest that any citizen might have under the possession of the bank and appellee would be entitled to attorney's fees for defending their tortious conduct." No such wrongful invasion is before us. Such situations would appear to be controlled by the dictates of Gilliland v. Rodriquez, 77 Ariz. 163, 268 P.2d 334 (1954) and Pioneer Constructors v. Symes, 77 Ariz. 107, 267 P.2d 740 (1954). In re Estate of O'Brien, 18 Ariz.App. 375, 502 P.2d 176 (1972) notes that attorney's fees may be recovered by the successful litigant where such recovery is provided by statute or contract; the security agreement in this case so provided. Lawrence v. Valley National Bank, 106 Ariz. 455, 478 P.2d 79 (1970) holds that the Court of Appeals may determine the amount to be awarded. Oral argument before this court was waived. The sum of $800 is awarded appellee for attorneys' fees on appeal.

Affirmed.

HATHAWAY, C. J., and KRUCKER, J., concur.

NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120(E).