## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 47296

MATTHEW V. LATVALA and )
BONNIE A. LATVALA, husband and )
wife, )
     )
        Plaintiffs-Respondents- )
        Cross Appellants, )
     )
v. )
     )
GREEN ENTERPRISES, INC., an Idaho )
Corporation; JAMES K. FRANK and )
JULIE B. FRANK, husband and wife; )
LARIMORE J. CUMMINS and )     **Boise, December 2020 Term**
KATHRYN CUMMINS, husband and )
wife; and all unknown persons claiming )     **Opinion Filed: May 3, 2021**
an interest in the road by the name of )
South Camp Bay Road, located in )     **Melanie Gagnepain, Clerk**
Bonner County, Idaho, )
     )
        Defendants-Appellants- )     **SUBSTITUTE OPINION.**
        Cross Respondents, )     **THE COURT'S PRIOR OPINION**
     )     **DATED MARCH 19, 2021 IS HEREBY**
and )     **WITHDRAWN.**
     )
GILL LIVING TRUST, acting through )
TRUSTEE DALE GILL; RUSSELL )
W. EDWARDS and JANET M. )
EDWARDS, husband and wife; CORAL )
MARIE EDWARDS; FRED GRUBB; )
CAMP BAY, LLC an Idaho limited )
liability company; MARION L. COX, )
     )
        Defendants. )
_____ )

Appeal from the District Court of the First Judicial District of the
State of Idaho, Bonner County.  Barbara Buchanan, District Judge.

The district court judgment is <u>affirmed</u> in part, <u>reversed</u> in part,
<u>vacated</u> in part, and <u>remanded</u> for further proceedings.

1

John F. Magnuson, Coeur d'Alene, for Appellants. John F. Magnuson argued.

Berg, McLaughlin & Nelson, Chtd., Sandpoint, for Respondents. D. Toby McLaughlin, argued.

_____

BEVAN, Chief Justice.

This appeal concerns whether a prescriptive easement exists to provide road access and utilities to a land-locked parcel and mining claim on Lake Pend Oreille in northern Idaho. Matt and Bonnie Latvala purchased the land-locked parcel, known as "Sulphide South," in 2015 and litigation soon followed. Following a four-day bench trial and site visit, the district court quieted a prescriptive easement to the Latvalas through and over what is known as South Camp Bay Road, as well as confirming and defining an express easement across another parcel known as "Sulphide North." Some[1] neighboring landowners appeal the district court's judgment, arguing the court's findings were not supported by substantial and competent evidence. These neighbors also argue that the district court erroneously allowed the prescriptive easement to be unreasonably expanded.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2015, Latvala[2] purchased a land-locked parcel of land known as Sulphide South, which was originally part of a patented mining claim on the shores of Lake Pend Oreille. With an interest in gem faceting and jewelry making, Latvala was keen to purchase a waterfront property with historical mineral rights. However, litigation arose in 2017 from conflicts over alleged easements and road access along privately owned South Camp Bay Road and Sulphide North.

### *History of Access to the Sulphide Lode*

On June 30, 1906, the U.S. Surveyor General for Idaho executed and approved a mining claim plat for a sulphide lode on the shores of Camp Bay on Lake Pend Oreille. The 1906 plat of the site depicts a tunnel but no roads running to, or within the sulphide claim. The lode produced

---

[1] Latvala originally brought suit against all landowners along South Camp Bay Road and Dale Gill, who holds title to Sulphide North. Defendants Green Enterprises, Inc., James K. Frank and Julie B. Frank, and Larimore J. Cummins and Kathryn Cummins appealed the district court's judgment. The remaining landowners, including Gill, did not appeal.

[2] Although the parties' names are often used in the plural in the briefing and record to showcase the families involved in the purchase and use of the properties—particularly as heirs inherit property over the years—singular family names have been used in this opinion to simplify matters unless it was necessary to distinguish a specific individual's actions.

silver and lead, and contained veins of quartz, pyrite, pyrothite, and galena. Work on the mine, however, has been limited and sporadic over the years. Documentation detailed the early mining history in 1905 to 1906 as follows: "an incline tunnel was driven in one [sic] the ore at the point of discovery for a distance of about 40 feet and 20 ton or more of ore taken out, which now lies on the dump." A few years later, in 1909, four men received a patent from the United States for the sulphide mining claim. Little is known of any work done over the next thirty years, except for some tunnels driven in the late 1930s. Relevant to this case are two tunnels (the upper tunnel and the lower tunnel) that both begin on Sulphide North. However, the sulphide lode ultimately reverted to Bonner County in 1939 for delinquent taxes.

In 1939, Howard B. Thomason ("H.B. Thomason") purchased the sulphide claim from Bonner County at a public auction. The same year, adjacent and unpatented mill sites were located, and Hilfred L. Thomason ("H.L. Thomason") filed the requisite notices and proof of labor pursuant to the General Mining Act of 1872. 30 U.S.C. § 28 (to retain his claim a locator must expend $100 of labor or improvements each year). This group of claims became known as the "Silver Fox Mine Group" and was comprised of the patented sulphide lode claim, and the surrounding unpatented Honest John, Lizzie S, Susan T, and mill site claims. For access to the Silver Fox mine claims, H.L. Thomason stated in a letter: "County road from Sagle, Idaho within one-half mile of property, private road balance of distance. Sagle, Idaho is R.R. station about 12 miles distant." In a separate affidavit, H.B. Thomason stated that the road leading to the sulphide claim "was in existence prior to 1938," and that he helped "extend said road within said claim."

Ultimately, the mine's production was "small" and intermittent, but documentation led the district court to conclude that work had been performed at the active sulphide mine and adjoining sites briefly in 1939, and regularly from 1946 to 1954. The proof of labor filed for 1939 reveals mining work performed for three years (between 1939 and 1942) at the mines and mill sites adjacent to—but not on—the sulphide lode. A letter from H.L. Thomason explained that the sulphide lode had been idle from 1939 to 1946 because equipment was lost due to a default in payments. The only work completed there in 1939 was to drive a "very short tunnel" at the lower level in an unsuccessful attempt to intersect the vein. Work recommenced in 1946 and additional proofs of labor were filed in 1948 and 1954, with ore shipments occurring regularly between 1947 and 1951. By 1954, workers had extended the upper tunnel and laid track the full length of both

3

mining tunnels on the property. At that point, the various ore shipments over the years had amounted to about 15 tons of ore removed from the mine.

In 1954, H.B. Thomason leased the sulphide lode and adjacent mining sites to A & J Mining Company for a five-year period. At the beginning of its lease, the A & J Mining Company applied to the U.S. Department of the Interior for federal assistance under the Defense Minerals Exploration Administration ("DMEA"), which encouraged exploration for critical and strategic minerals. The company's lease agreement established the 1954 condition and access of the mine as follows:

> 4(a) The upper tunnel has been driven to a depth of 155 ft. Track has been laid the full length. The mine is in operation in this tunnel. The lower tunnel has been driven to a depth of 133 ft. Track has been laid the full length. No ore has been encountered in this tunnel. We believe that a large body of ore lies approximately 60 ft. straight ahead. The reason for this application is to complete this cross-cut. We have the necessary equipment, including compressor, drifter, winch, ore car, and necessary hand tools.
> There are good roads right to both mine shafts. Electricity is available from 300 ft. away. This would be furnished by the Northern Lights, Inc.
> A & J. Mining Co. are the complete lessees of claims covered by this application. The mine is 18 miles from Sandpoint, Idaho, and is an easy 30 minute drive from Sandpoint, and is accessible the year around.
> (b) There has been no past production in either the upper or lower tunnels. Current production from the upper tunnel is approximately two tons per day. Ore reserves are unknown.
> (c) Mineralization - Lead & silver. Gang matter is quartz. Type of deposit is vein. We have been told by geologists and mining engineers that a large body of ore lies approximately 60 ft. ahead of present tunnel heading.
> (d) Roads built directly to mine entrances. Distance to Smelter at Kellogg, Idaho is 75 miles. Distance to supplies and residence is 18 miles.
> (e) Manpower, materials, supplies and equipment are readily available. Water is within 100 ft. of the mine. Power is available at 300 ft.

While the DMEA application was ultimately denied, the inspection report recorded similar notes on access to the mine, stating, "[t]he property is reached by dirt road which leaves U.S. 95 at the Talache turnoff about 3 ½ miles south Sandpoint," and was followed "in a general southeast direction for 8 miles to Mineral Point, a promontory into Pend Oreille Lake on which the prospect is located." Along with this report, the Department of the Interior inspectors hand-drew a map, showing only one access road terminating at the upper tunnel.

No evidence in the record shows mining activity after 1959. In 1969, the sulphide claim changed hands again when Thomason sold the property to Harlow M. McConnaughey. According

4

to an affidavit of McConnaughey's daughter, her family accessed the sulphide claim by the public Camp Bay Road and private South Camp Bay Road "on several occasions." The United States Forest Service ("USFS") also issued a permit to McConnaughey to access the sulphide lode property "across National Forest land on the existing roads with a special use permit," noting "[w]e do not have right-of-way across the private land between our land and the county road." By then, as it does today, the property surrounding these parcels belonged to the USFS and is designated as part of the Kaniksu National Forest. Between the eastern boundaries of private land and the northern border of Sulphide North lies a small triangular parcel of USFS land with South Camp Bay Road passing through it.

In 1982, McConnaughey divided the patented sulphide claim into two parcels: Sulphide North and Sulphide South. All of the mining tunnels and structures originate on Sulphide North. McConnaughey conveyed Sulphide North to the Whortons through a warranty deed that reserved "a right of way for ingress and egress for the benefit of the Southerly portion of the said Sulfide Lode Mining Claim, location to be subsequently agreed upon." During McConnaughey's continuing ownership of Sulphide South, Sulphide North passed from Whorton to Zollinger in 1982, and then ultimately to Dale Gill in 2005.

To access Sulphide North, Gill obtained a right-of-way easement from his neighbors to use the portion of South Camp Bay Road crossing their property. Upon purchasing the property Gill also built a gate at the border of Sulphide North and USFS land, near the point where South Camp Bay Road terminates within his property. According to Gill, "access beyond this point, extending southward across [Sulphide North] is neither practical, feasible, nor possible." When asked at his deposition about other roads on Sulphide North, Gill explained, "There's [sic] remnants of roads. There is a road on the upper mine on my property, that you could tell there was access from somewhere to that mine. But that area is pretty well grown over."

Gill claims that from 2005 to 2018 he did not permit vehicles beyond his gate. Indeed, when the last McConnaughey heir inherited Sulphide South in 2009 and went to visit the property, Gill barred his access and McConnaughey resorted to accessing the property by foot from then on, using a trail to the southwest of Sulphide South. John McConnaughey offered this notarized statement in the record:

> The only time I ever used South Camp Bay Road to access my portion of the Sulphide Lode property was during the month of July 2009, which was shortly after my siblings and I inherited it. At that time I was accosted by Mr. Dale Gill who

5

> informed me I was trespassing on his property and he wanted me to leave. After that event whenever I wanted to access my portion of the Sulphide Lode property I used the Mineral Point Trail road where I parked my vehicle and proceeded to walk approx. ¼ mile to my portion of the Sulphide Lode property.

Recognizing that their express easement reserved in the 1982 deed only permitted access across Sulphide North, other McConnaughey family members sought an easement across the property of another neighbor, Fred Grubb, to utilize South Camp Bay Road. A few years later, the McConnaugheys decided to sell Sulphide South with disclosures that there was no legal road access to the property. The property listing explained that access was by "legal easement across Sulphide North," but road access to Sulfide South would be by Green Bay Road and then proceeding on foot up Mineral Point Trail.

*History of South Camp Bay Road and Neighboring Properties*

Northwest of the sulphide claim are three lots pertinent to this case, two of which were originally issued to Lida H. Putnam in 1907 by a patent from the United States. The third lot at issue was granted to John van Schravendyk in 1909. Each of these lots has changed ownership over the years, but they remain privately owned with South Camp Bay Road running through them. Putnam's property, known as Lots 1 and 2, was conveyed first to Seth Foster (1931), then to Florence Foster (1935), and then to S. Hale Foster and others (1945). At this point, the property owners created Cedarside Plats, 17 waterfront parcels along South Camp Bay Road. Today, the Cedarside Plats parcels have homes and retaining walls constructed on them, and each parcel is owned by one of the various defendants who was originally sued in this case. When the homes were built, supplies were brought in on South Camp Bay Road and damage to the road was repaired later. Fred Grubb owns the bulk of the undeveloped sections of Putnam's original lots (known now as Tract A). North of Putnam's lots is Lot 3, which van Schravendyk homesteaded with his wife. This property is currently owned by Green Enterprises, Inc., with President Jim Green inheriting the property from his grandparents, the van Schravendyks.

Following John van Schravendyk's 1908 petition, Bonner County made Camp Bay Road a public road. The public Camp Bay Road terminates within Lot 3, which is Green's property today. The privately owned and maintained South Camp Bay Road then proceeds south from that termination point through Lot 3 and into Lots 1 and 2, crossing several Cedarside Plat parcels. In 1927, van Schravendyk granted a right-of-way on South Camp Bay Road to Putnam for the benefit of her lots. The agreement for this right-of-way was recorded in Bonner County, Idaho, in 1930.

Later on, in 1947, van Schravendyk granted utilities access through a right-of-way easement for electrical distribution to Lot 3. Foster granted a similar easement in 1950 for electricity to come to Cedarside Lots. Today, South Camp Bay Road is marked with a "no trespassing" sign warning that access is limited to lot owners only.

Together with this history, both Latvala and the defendants submitted multiple maps to the trial court to show the history of roads in this area. Two U.S. Geological Survey Maps from 1949 and 1951 each show a road traveling to the southeast from Camp Bay Road towards the sulphide claim property. These maps also show that southeasterly road splitting into two branches, each heading towards the sulphide claim. A 1960 and a 1974 Metsker map each show the road with these two branches, as do various contemporary Kaniksu National Forest maps. That said, these roads were not portrayed on the 1939 Metsker map despite H.B. Thomason's affidavit stating a road's existence.

Defendants also pointed to the historical use of boats to transport mined ore across Lake Pend Oreille as evidence disputing Latvala's claims. Defendants specifically cited a 1906 newspaper article discussing a different mine on Garfield Bay: "The main lead is only a few rods from the lake front and the accessibility to transportation is a wonder in itself as the expense of getting the ore from the mine to the boat will be practically nothing." However, no evidence was presented at trial that the particular sulphide claim at issue here ever used boats or a dock to transport material to or from the sulphide claim property.

*Latvala's Purchase of Sulphide South & the Subsequent Litigation Proceedings*

On November 12, 2015, Latvala bought Sulphide South from McConnaughey with the intent to use the property for residential purposes. Latvala had first inspected the property in 2009 and again in 2015. He became interested in the property because of his work in gem faceting, lapidary, and making jewelry, and planned to use Sulphide South for both personal mineral and residential purposes. Latvala testified that he and his wife "could not reasonably work our Sulphide mining property without vehicle access for reasons including steep terrain and the impracticality of carrying the equipment and materials needed for mining operations on foot."

Sulphide South is a steep property with cliffs at its center and only two benches on which a structure could be built. The lower bench (closer to the lake) is accessible by South Camp Bay Road and then walking across Sulphide North, while the upper bench—separated from the lower bench by a cliff and ridgeline—is best accessed from Mineral Point Trail and the public Green

7

Bay Road, each of which lies to the southwest of the sulphide claim properties. Prior to purchasing Sulphide South, Latvala explained that he accessed the property "on various occasions" by parking on the USFS parcel at the end of South Camp Bay Road "and then traversing an existing visible route" across Sulphide North. After purchasing Sulphide South, Latvala installed safety ropes to access the upper bench from the lower bench, as well as ropes to ascend the steep shoreline. Interactions with neighbors soon became contentious as Latvala informed them of his plans to extend South Camp Bay Road across Sulphide North and construct a home on Sulphide South. Gill called Latvala and informed him there was no easement across Sulphide North for access, while other neighbors informed Latvala he was trespassing by using South Camp Bay Road.

In August 2017, Latvala sued each neighbor along South Camp Bay Road, including Gill, Cummins, Frank, Camp Bay LLC, Green Enterprises, Inc., and others. Latvala sought to establish rights of access and utilities to Sulphide South on multiple legal theories, including a prescriptive easement, easement by implication from prior use, easement by necessity, express easement via Sulphide North, a public right-of-way over South Camp Bay Road, and eminent domain. In addition, Latvala sought to establish the boundary line between Sulphide South and Sulphide North, obtain injunctive relief to bar trespassing and any interference with Latvala's access to Sulphide South, and collect damages against Gill for removing survey markers. The defendants filed a motion for summary judgment; however, the district court denied the motion after determining that multiple triable issues of fact existed.

The district court held a four-day bench trial. At the close of evidence, the court accompanied counsel, Latvala, Gill, and Green to view the property site. On July 9, 2019, the district court issued a sixty-page opinion laying out its findings of fact and conclusions of law. The district court found that ore shipments and general access would have occurred by road, rather than by boat, and thus would have been by the "Upper Branch" and "Lower Branch" of South Camp Bay Road marked on the Metsker and U.S. Geological Survey maps. While the Upper Branch was too overgrown and out of use to locate with any certainty, the district court found that the still-present Lower Branch to the lower mine tunnel had existed since at least 1939. Thus, the court denied Latvala's claim for a prescriptive easement over a road that no one could locate, but granted Latvala's claim for a prescriptive easement over the Lower Branch, which it concluded is South Camp Bay Road. Likewise, because the prescriptive easement was created by the operations of an active mine, the district court determined that the scope of the easement included access to

8

Sulphide South, transport of labor and materials to build a home, and the construction of an access road across Sulphide North. Lastly, the court found that Sulphide North is subject to an express easement for access to Sulphide South, as recorded in the 1982 McConnaughey-Whorton warranty deed. Because of these decisions, Latvala's remaining claims were rendered moot.

Following the judgment, Latvala filed a motion for costs while only Green Enterprises, Frank, and Cummins timely appealed to this Court. Gill and the other defendants did not join them or file for appeal, so the district court's decision is final as to them. On September 5, 2019, the district court entered an amended judgment, awarding costs, but not attorney fees, to Latvala. Appellants amended their notice of appeal to include the amended judgment's award of costs. Latvala filed a cross-appeal to present the additional issue of whether the district court erred in finding certain issues moot.

## II. ISSUES ON APPEAL

1. Whether the district court erred in determining there was a prescriptive easement.
2. Whether the district court's conclusions created an unreasonable expansion of the prescriptive easement.
3. Whether the district court erred in awarding costs to Latvala.
4. If the Court reverses the district court's judgment, whether Latvala's other claims are moot.

## III. STANDARD OF REVIEW

"Following a bench trial, this Court's review 'is limited to ascertaining whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law.' " *Morgan v. New Sweden Irr. Dist.*, 160 Idaho 47, 51, 368 P.3d 990, 994 (2016) (quoting *Borah v. McCandless*, 147 Idaho 73, 77, 205 P.3d 1209, 1213 (2009)). The province of weighing conflicting evidence and testimony, and judging the credibility of witnesses, belongs to the trial court. *Borah*, 147 Idaho at 77, 205 P.3d at 1213. Thus, "this Court will liberally construe the trial court's findings of fact in favor of the judgment entered." *Id.* The Court will not set aside the trial court's findings of fact unless they are clearly erroneous, nor will the Court "substitute its view of the facts for that of the trial court." *Id. See also* I.R.C.P. 52(a)(7) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

Even in the face of conflicting evidence, clear error will not be found to exist where the findings are supported by substantial and competent evidence. *Mortensen v. Berian*, 163 Idaho 47, 50, 408 P.3d 45, 48 (2017) (citing *Pandrea v. Barrett*, 160 Idaho 165, 171, 369 P.3d 943, 949

(2016). "If there is evidence in the record that a reasonable trier of fact could accept and rely upon in making the factual finding challenged on appeal, there is substantial and competent evidence." *Id.* The substantial evidence standard for appellate review requires a greater quantum of evidence when the trial court's finding must be supported by clear and convincing evidence, than when mere preponderance is required. *Sowards v. Rathbun*, 134 Idaho 702, 707, 8 P.3d 1245, 1250 (2000) (internal citation omitted).

"[W]hen reviewing the trial court's findings of fact in a case in which the facts must be established by clear and convincing evidence, the job of the reviewing court is simply to determine whether there is substantial and competent evidence to sustain the finding." *Id*. Still, this Court exercises free review over a trial court's conclusions of law, including the question "of whether the facts found, or stipulated to, are sufficient to satisfy the legal requirements for the existence of an implied easement or a prescriptive easement." *Backman v. Lawrence*, 147 Idaho 390, 394, 210 P.3d 75, 79 (2009).

## IV. ANALYSIS

**A. The district court's judgment finding that a prescriptive easement existed to access Sulphide South via South Camp Bay Road is supported by substantial evidence.**

After examining the history of the sulphide claim, South Camp Bay Road, and the surrounding properties, the district court found that Latvala established, by reasonably clear and convincing evidence, that the road's use for mining purposes was "open and notorious, continuous and uninterrupted, and adverse and under a claim of right for a period of eight years — from 1946 through 1954." As a result, the court concluded that Latvala established a prescriptive easement, and the easement is appurtenant. The parties do not challenge the district's court conclusion that the prescriptive easement is appurtenant. Instead, Green Enterprises and the other appellants argue that the court disregarded substantial evidence contrary to its conclusion that a prescriptive easement had been established, specifically emphasizing the record citations to only one road (the "Upper Branch") and that access to local mines was mainly by boat. Latvala argues, and we agree, the Appellants are simply asking this Court to reweigh the conflicting evidence in the record.

### 1. "Reasonably" Clear and Convincing Evidence Standard of Proof.

The parties have not challenged the general statement by the district court about the standard of proof it applied in making its decision here – one of "*reasonably* clear and convincing evidence." As a result, we have not been asked to decide whether "reasonably clear and convincing evidence" is synonymous with "clear and convincing evidence." Even so, we conclude that going

10

forward the "*reasonably* clear and convincing" standard should be avoided. It leads to potential confusion about whether "reasonably" clear and convincing evidence is not really "clear and convincing evidence."

The language "*reasonably* clear and convincing evidence" first appeared in Idaho jurisprudence 100 years ago in *Fehr v. Haworth*, 33 Idaho 96, ___, 190 P. 248, 248 (1920), when the Idaho Supreme Court held that "[f]raud is not presumed, and an allegation thereof must be sustained by *evidence reasonably clear and convincing*." (Emphasis added). Two years later the Court held in a prescriptive easement case that "[r]espondents having alleged a prescriptive right, the burden rested upon them to establish it by evidence *reasonably clear and convincing*." *Last Chance Ditch Co. v. Sawyer*, 35 Idaho 61, ___, 204 P. 654, 654 (1922) (emphasis added). Since that time, thirty-four other cases have included this reasonableness language when discussing the standard of proof as applied to prescriptive easement questions like the one before us. The most-recent of those cases was ten years ago in *Weitz v. Green*, 148 Idaho 851, 860, 230 P.3d 743, 752 (2010), when this Court again cited the standard the district court relied on here: "In order to establish a private prescriptive easement, a claimant must present *reasonably clear and convincing* proof of open, notorious, continuous, and uninterrupted use under a claim of right and with the knowledge of the owner of the servient tenement for the prescriptive period of five years." (Emphasis added).

More recently, however, we have held that the standard in prescriptive easement cases is purely one of "clear and convincing evidence," with no reference to "reasonably" as a required adverb. *See Lemhi Cty. v. Moulton*, 163 Idaho 404, 408, 414 P.3d 226, 230 (2018). In *Moulton*, this Court cited both *Hughes v. Fisher*, 142 Idaho 474, 480, 129 P.3d 1223, 1229 (2006), and *Hodgins v. Sales*, 139 Idaho 225, 229, 76 P.3d 969, 973 (2003), for the same proposition – and neither of these cases references "reasonably" clear and convincing evidence.

We have yet to clarify this discrepancy – or even recognize the distinction. Therefore, we now confirm, as our cases utilizing that standard have implicitly recognized, that the "reasonably clear and convincing" standard is equivalent to the "clear and convincing" standard. *See*, *e.g.*, *Weitz*, 148 Idaho at 860, 230 P.3d at 752; *Backman*, 147 Idaho at 396, 210 P.3d at 81; *Brown v. Miller*, 140 Idaho 439, 443, 95 P.3d 57, 61 (2004); *Baxter v. Craney*, 135 Idaho 166, 173, 16 P.3d 263, 270 (2000). Thus, we hold that the district court applied the appropriate standard of proof to

11

the evidence before it in reaching its conclusion. Still, to avoid confusion in the future, we take this opportunity to disavow any future reliance on a "reasonably clear and convincing" standard.

2. <u>The district court's finding that a prescriptive easement existed to access Sulphide South via South Camp Bay Road is supported by substantial evidence.</u>

"An easement is the right to use the land of another for a specific purpose that is not inconsistent with the general use of the property by the owner." *Hodgins v. Sales*, 139 Idaho 225, 229, 76 P.3d 969, 973 (2003). To establish an easement by prescription, Latvala had to "prove, by clear and convincing evidence, that use of the subject property was: (1) open and notorious, (2) continuous and uninterrupted, (3) adverse and under a claim of right, (4) with the actual or imputed knowledge of the owner of the servient tenement (5) for the statutory period of five years." *Backman*, 147 Idaho at 396, 210 P.3d at 81 (citation and internal quotation marks omitted). "Each element is essential to the claim, and the trial court must make findings relevant to each element in order to sustain a judgment on appeal." *Id.*

"Whether a party presented sufficient evidence to meet the clear and convincing standard is a finding of fact that this Court will uphold if substantial and competent evidence supports it." *Snider v. Arnold*, 153 Idaho 641, 644, 289 P.3d 43, 46 (2012) (citing *Hettinga v. Sybrandy*, 126 Idaho 467, 469, 886 P.2d 772, 774 (1994)). The substantial evidence standard for appellate review requires a greater quantum of evidence when the trial court's finding must be supported by clear and convincing evidence, than when a mere preponderance is required. *Sowards*, 134 Idaho at 707, 8 P.3d at 1250). "[W]hen reviewing the trial court's findings of fact in a case in which the facts must be established by clear and convincing evidence, the job of the reviewing court is simply to determine whether there is substantial and competent evidence to sustain the finding." *Id.*

### a. *Open and Notorious*

The prescriptive use of property must be open and notorious so that "a reasonable person would have discovered its occurrence." *Backman*, 147 Idaho at 396, 210 P.3d at 81. This requirement "give[s] the owner of the servient tenement knowledge and opportunity to assert his rights against the development of an easement by prescription." *Halvorson v. N. Latah Cnty. Highway Dist.*, 151 Idaho 196, 204, 254 P.3d 497, 505 (2011) (quoting *Anderson v. Larsen*, 136 Idaho 402, 406, 34 P.3d 1085, 1089 (2001)). Thus, "[t]he open and notorious use must rise to the

level reasonably expected to provide notice of the adverse use to a servient landowner maintaining a reasonable degree of supervision over his premises." *Id.*

After examining the various records and accounts of the sulphide claim, the district court found it was an active mine from 1946 to 1954. Workers laid tracks within the full lengths of the tunnels and drove the tunnels deeper in pursuit of connecting veins. Ore shipments over the years totaled about 15 tons by 1954, with regular shipments recorded occurring between 1947 and 1951. With multiple employees, the miners would have travelled to and from the mine regularly, as would supplies from the local towns. In addition, the plethora of tools and equipment necessary to complete this work would have been brought to the sulphide claim property to replace the equipment lost in the 1939 defaults. No proof was offered that shipments or travel to the sulphide claim occurred by boat. The court also found that the upper and lower branches of the road depicted on multiple maps led to the approximate locations of the two mining tunnels on the present day Sulphide North parcel. While at the time of trial the upper branch had become overgrown and the upper tunnel had since collapsed, the district court concluded the lower branch of private road leading to the claim could only be South Camp Bay Road. Such mining activity and transportation would have been sufficiently open and notorious for servient landowners along the South Camp Bay Road to discover its occurrence.

While there is some contradictory evidence in the record that other mines in the area used boats for shipments, there is no evidence in the record that the sulphide claim itself used boats for transport across the lake. Likewise, the maps and references of a single road do not eliminate the existence or use of South Camp Bay Road to access the lower mine. The upper mine tunnel produced ore while the lower tunnel did not. Thus, the 1954 DMEA inspection and map would have focused on the productive tunnel. Notably, the reports still account for both tunnels and the DMEA application states there were "[r]oads built directly to mine *entrances*." (Emphasis added). Likewise, work continued on the lower tunnel in the hopes of striking ore and connecting to other mineral veins. The record is clear that there were only two mining tunnels and most contemporary maps show two roads leading to the sulphide claim, including what is now South Camp Bay Road. Ultimately, vehicles and men—including shipments of ore—would have been moving up and down these roads for access to and from the property for eight years. Thus, the district court's conclusion that the use was open and notorious is supported by substantial and competent evidence in the record.

### b. Continuous and Uninterrupted

The district court next concluded that the prescriptive use of South Camp Bay Road was continuous and uninterrupted over an eight-year period. This determination rested on the same set of facts used to determine the use was open and notorious. The mine was in operation from 1946 to 1954, with regular ore shipments, employees using the road for access, and hauling equipment to the sulphide claim. It is generally accepted that the "continuous and uninterrupted" element does not require daily use or even monthly use. *Beckstead v. Price*, 146 Idaho 57, 63 n.1, 190 P.3d 876, 882 n.1 (2008) (citing 25 Am.Jur.2d Easements and Licenses § 61 (2004)). The acquisition of a prescriptive easement requires continuous use "according to the nature of the use and the needs of the claimant." *Id*. Therefore, the district court's conclusion that the use was continuous and uninterrupted during the eight years the mine was in operation is supported by substantial and competent evidence in the record.

### c. Adverse and Under a Claim of Right

A party's use is adverse where "it runs contrary to the servient owner's claims to the property." *Hodgins*, 139 Idaho at 231, 76 P.3d at 975. "The state of mind of the users of the alleged easement is not controlling; instead, the focus is on the nature of their use." *Backman*, 147 Idaho at 397–98, 210 P.3d at 82–83. When a "claimant presents proof of open, notorious, continuous, uninterrupted use of the claimed right for the prescriptive period, even without evidence of how the use began, he raises the presumption that the use was adverse and under a claim of right." *Akers v. D.L. White Const., Inc.*, 142 Idaho 293, 303, 127 P.3d 196, 206 (2005). Then the burden of proof "shifts to the owner of the servient tenement to show that the claimant's use was permissive, or by virtue of a license, contract, or agreement." *Id.*

The Appellants have not shown any permissive use of South Camp Bay Road at trial or on appeal. While van Schravendyk granted a right-of-way on South Camp Bay Road to Putnam for the benefit of her lots in 1927, no record of a similar right-of-way has been shown for any owner of the sulphide claim over the years, including by H.B. Thomason, who owned the mine from 1946 to 1954. Likewise, when members of the McConnaughey family sought a right-of-way from Cedarside Plat owners to use portions of South Camp Bay Road for access to Sulphide South, it was denied. For these reasons, the district court's conclusion that the use was adverse is supported by substantial and competent evidence in the record.

### d. With the Actual or Imputed Knowledge of the Owner

14

As above, the district court determined that the open, notorious, uninterrupted, and continuous uses of the property would have been done with the knowledge of the servient landowners. *See Backman*, 147 Idaho at 398, 210 P.3d at 83 ("Generally, where a claimant establishes open, notorious, continuous and uninterrupted use under a claim of right for the statutory period, knowledge of the owner may be presumed."). The district court noted that to the extent the lower branch road may have been used by the general public for fishing and camping in the years in question, any such summer recreational use by the public did not thwart Latvala's claim. Any public use was not "the same degree of use" as vehicles full of "men, materials, supplies, and equipment travelling back and forth to the lower mine year round." This finding is supported by substantial evidence. It follows the principle that only where "the same degree of use upon which the adverse claim is based has been [generally] exercised *indiscriminately* by the general public," is the assertion of actual knowledge by the servient estate holders impossible. *Id.* at 398–99, 210 P.3d at 83–84 (emphasis added).

Evidence of general access to Sulphide South by the public was not demonstrated at trial, nor is there evidence any mining operations continued beyond 1959. However, during the years 1946 to 1954, the active mining operations would have been known by neighboring and servient landowners as Thomason used South Camp Bay Road for access and transportation of ore, men, equipment, and supplies. Thus, the district court's conclusion that the use was done at the knowledge of the servient landowners is supported by substantial and competent evidence in the record.

### e. For the Statutory Period of Five Years

In 2006, the statutory time period for a prescriptive easement was extended to twenty years. *Capstar Radio Operating Co. v. Lawrence*, 153 Idaho 411, 420 n.2, 283 P.3d 728, 737 n.2 (2012). Historically, however, the time period was five years. *Id.* Accordingly, "the twenty year time period does not apply to an easement by prescription acquired prior to the amendment." *Id.* Because the mine was active for eight years (1946 to 1954), the statutory time period of five years was met.

Altogether, the district court made factual findings on each element of Latvala's claim and concluded that Latvala had shown, by clear and convincing proof that the mining use occurred for an uninterrupted five-year period; thus, Latvala established a prescriptive easement. While the Appellants point to conflicting evidence in the record, each contrary piece of evidence was

15

carefully considered and weighed by the district court in its findings. Ultimately, there was sufficient evidence for the trier of fact to conclude that a prescriptive easement was established by clear and convincing evidence. We hold the district court's findings were supported by substantial and competent evidence in the record.

## B. The district court impermissibly expanded the scope of the prescriptive easement.

The district court next concluded that Latvala's proposed residential use fell within the scope of the prescriptive easement and would not increase the burden on property owners along South Camp Bay Road for Latvala's access, or for construction crew and materials to access Sulphide South for the construction of a home there. In addition, the court determined that the express easement permitted the construction of a road crossing Sulphide North, ultimately extending South Camp Bay Road to access Sulphide South. Appellants do not challenge the existence of the express easement across Sulphide North, but argue that the road development and residential use of Sulphide South are unreasonable expansions of the prescriptive easement. We agree.

A determination that a claimant has established a prescriptive easement involves entwined questions of law and fact. *Beckstead v. Price,* 146 Idaho 57, 61, 190 P.3d 876, 880 (2008). But, whether the increased use of the road amounts to an "expansion of the original easement" or merely an "increase in degree of use" is solely a question of law. *Gibbens v. Weisshaupt*, 98 Idaho 633, 638, 570 P.2d 870, 875 (1977). Courts closely scrutinize prescriptive easement rights because a prescription is a penalty against a landowner. *Beckstead*, 146 Idaho at 64, 190 P.3d at 883. "As a general rule, an easement acquired by prescription is confined to the right as exercised during the prescriptive period. . . . While some change of usage is permissible, any changes in the use of a prescriptive easement cannot result in an unreasonably increased burden on the servient estate." *Elder v. Nw. Timber Co.*, 101 Idaho 356, 359, 613 P.2d 367, 370 (1980) (citations and internal quotation marks omitted). Thus, "any changes in the use of a prescriptive easement cannot result in an unreasonabl[y] increased burden on the servient estate and that the increase in use must be reasonably foreseeable at the time the easement is established." *Gibbens*, 98 Idaho at 639, 570 P.2d at 876.

*Gibbens v. Weisshaupt*, is the seminal case addressing the scope of a prescriptive easement and subsequent changes in use. In *Gibbens* there was a dispute between neighboring landowners over the "scope" of a prescriptive easement. *Id.* at 636, 570 P.2d at 873. The "scope" of an

16

easement means the extent of the privilege of use, including the time (e.g., day/night, summer/winter), place (the location of the easement area and the parcel it benefits), manner (e.g., foot traffic, automobile traffic, trucks, recreational vehicles), and purpose of use (e.g., ingress/egress, utilities). *See* Restatement (First) of Property V I 39 Intro. Note (1944) ("Within the scope of the privilege of use are included the elements of time, place, manner, and purpose of use.").

From the early 1930s until about 1970, the owners of the 700-acre parcel in *Gibbens* used a dirt road located on a neighboring 20-acre parcel as a means of ingress and egress for a single family residence, farm, and cattle operation. 98 Idaho at 635–36, 570 P.2d at 872–73. The Connollys (two of the plaintiffs) purchased the 700-acre parcel in 1967. *Id.* at 636, 570 P.2d at 873. In 1970, they sold ten acres of the parcel to a commercial greenhouse operation that employed 20-30 people, and they eventually sold four other parcels to families who then built homes. *Id.*

In 1973, a dispute over the use of the dirt road came to a head when the Weisshaupts, the owners of the 20-acre parcel, built a fence that limited the width of the dirt road to 12 feet. *Id.* The Connollys, the other homeowners, and the greenhouse operation sued the Weisshaupts to establish the existence of a prescriptive easement across the 20-acre parcel and to prohibit the Weisshaupts from interfering with their use of it. *Id.* After a trial, the district court decided in favor of the Connollys and the other plaintiffs, ruling that an easement for ingress and egress existed and that it was 40 feet in width where the dirt road adjoined another road and 22 feet in width elsewhere. *Id.* The district court held that the increase in road use after the Connollys' sale to the greenhouse operation and the construction of the other family homes was only an "increase in degree of use" and did not constitute an impermissible expansion of the scope of the original prescriptive easement. *Id.* The Weisshaupts appealed. *Id.*

On appeal, this Court, much like in this case, affirmed the existence of the prescriptive easement, but reversed the district court's decision concerning scope, holding that the increased traffic caused by the greenhouse operation and the four additional family residences on the 700-acre parcel extended beyond the original use for a single family residence, farm, and cattle operation. *Id.* at 639, 570 P.2d at 876. The Court quoted favorably from a California case that held the scope of a prescriptive easement is fixed and determined by the manner of use in which it originated:

17

When an easement is acquired by prescription, the extent of the right is fixed and determined by the manner of use in which it originated. An easement acquired by prescription cannot be extended or increased so as to enlarge the burden except by grant or by adverse user which has been acquiesced in for the required statutory time. One who has acquired an easement by prescription or by grant may not use it to impose a substantial increase or change of burden on the servient tenement. The scope of a prescriptive easement is determined by the use through which it is acquired. A person using the land of another for the prescriptive period may acquire the right to continue such use, but does not acquire the right to make other uses of it.

*Id.* at 638, 570 P.2d at 875 (quoting *Bartholomew v. Staheli*, 195 P.2d 824, 828–29 (Cal. Ct. App. 1948) (citations omitted in *Gibbens*)).

The Court in *Gibbens* was also careful to recognize, however, that not every increase in the use of a prescriptive easement is an impermissible expansion and provided a two-part legal test to be used when addressing this issue:

We do not mean to imply from our decision today that any increase in use of a prescriptive easement is an expansion. Our decision is consistent with §§ 478 and 479 of the Restatement of Property concerning evolution and expansion of easements. Rights obtained by prescription should be strictly limited, and we read these sections of the Restatement narrowly. We are aware that some changes in the character of the dominant estate are foreseeable and will necessitate changes in the use of a prescriptive easement. *We however emphasize that any changes in the use of a prescriptive easement cannot result in an unreasonable increased burden on the servient estate and that the increase in use must be reasonably foreseeable at the time the easement is established.*

*Id.* (emphasis added) (footnote omitted). The Court went on to give an example of a permissible change in use to illustrate its point:

The respondents Wallace and Eda Connolly purchased the dominant estate in 1967. The respondents leased portions of their property for pasturage and cattle were hauled over the roadway in question. Any increase in use caused by these leasing operations would not be an expansion of the easement, merely a permissible increase in degree of use. The original easement contemplated the operation of a cattle ranch and the further development of this cattle ranch would be foreseeable. Also this additional use would not amount to an unreasonable increased burden because of the infrequency of the trips.

*Id.* at 639, 570 P.2d at 876.

Two years after *Gibbens* was decided, the Court emphasized that it would not be inexorably bound by sections 478 and 479 of the Restatement and reiterated that these provisions should be read narrowly since prescriptive easements are to be closely scrutinized and strictly limited. *Aztec*

18

*Ltd., Inc. v. Creekside Inv. Co.*, 100 Idaho 566, 570, 602 P.2d 64, 68 (1979). In a word, Idaho law disfavors prescriptive easements and their expansions.

To analyze whether Latvala's planned use will result in an "unreasonable increased burden" we need to first identify what is being compared. While section 478 of the Restatement (First) of Property was cited in a footnote in *Gibbens*, the framework it sets forth is vital and makes it clear that the planned use of the easement must be compared with the historical pattern of use that created the easement:

> In ascertaining whether a particular use is permissible under an easement created by prescription a comparison must be made between such use and the use by which the easement was created with respect to
> (a) their physical character,
> (b) their purpose,
> (c) the relative burden caused by them upon the servient tenement.

*Gibbens*, 98 Idaho at 639 n.2, 570 P.2d at 876 n.2 (quoting Restatement (First) of Property § 478 (1944)).

This Court has not had occasion to explain what constitutes an "unreasonable increased burden," but a comment to section 479 of the Restatement provides a useful explanation:

> An unreasonable increase in burden is such a one as it is reasonable to assume would have provoked the owner of the land being used to interrupt the use had the increase occurred during the prescriptive period.

Restatement (First) of Property § 479 cmt. c (1944). In other words, when examining whether a planned use of a prescriptive easement would impose an unreasonable increased burden, the focus of the inquiry should be on whether it is reasonable to conclude that the owner of the land where the easement is located would have objected to the increased use had it occurred during the prescriptive period.

The district court held the purpose of the easement during the prescriptive period was for ingress and egress to the Sulphide Lode property (Sulphide North and Sulphide South) and was used by motor vehicles to transport laborers, hand tools, mining equipment (e.g., rails, ore cars, a compressor, and a drifter (rock drill)), and 15 tons of ore. Latvala's planned use of South Camp Bay Road must be measured against this historical usage.

The Appellants focus on the intensification of use that could occur as a result of the proposed construction of a permanent road across Sulphide North, particularly if that road requires retaining walls. Latvala hired Jeff Jensen, a licensed civil engineer at Sewell & Associates to

19

design a road that would extend the existing road over Sulphide North to allow access to Sulphide South. The preliminary design included retaining walls. At trial, Latvala presented testimony of several experts who opined that a higher concentration of bedrock in the soil may reduce or eliminate the need for retaining walls, but all agreed that Sewell's design was feasible, that the road could be built, and that the location set forth in the plans was the most feasible route. Without specifying whether retaining walls would ultimately be required, the district court held that "the designs are preliminary and the road dimensions and specifications therein may change as necessitated by conditions on the ground during construction. Therefore, the Court further finds that any such changes fall within the limits of this grant [of the prescriptive easement]." On appeal, Appellants allege the road will require 350 concrete blocks, each weighing 2,000 pounds or, alternatively, pouring a concrete retaining wall in place through the use of cement mixers varying in width between 8 and 9.5 feet. The Appellants describe the veritable parade of semi-trucks and trailers, cement mixers, excavation equipment, and construction materials that might need to travel down South Camp Bay Road to construct such a road across Sulphide North—a road to access a parcel that has never been developed or used for any purpose.

Scrutinizing the prescriptive claim narrowly, as we are required to do, we hold that the district court erred in concluding that the construction of a road across Sulphide North using South Camp Bay Road would not expand the scope of the easement and amount to an increased burden on the servient landowners, particularly if that road ends up requiring retaining walls. Again, "[t]he scope of a prescriptive easement is determined by the use through which it is acquired." *Gibbens*, 98 Idaho at 638, 570 P.2d at 875. While there was heavy equipment, miners and associated paraphernalia involved in working the sulphide mine shafts from 1946-1954, there is no proof that the road usage required for such work equates to what would be required to build the road Latvala now contemplates. We hold that Latvala's proposed construction of a road across Sulphide North using South Camp Bay Road would impermissibly expand the use of the prescriptive easement as to the landowners who have appealed.

We also diverge from the district court's conclusion that building a residence on Sulphide South was reasonably foreseeable in 1946-1954. While the district court noted that 17 waterfront lots were platted in 1947, there is no proof in the record that any "residence" was ever located on

Sulphide South[3] for the prescriptive period, and the only structures on Sulphide North were a mill and a tool and dry shed. No residential, mining, or other purpose has been established for Sulphide South. As the Appellants put it: "the Latvala property has never been used for anything." The existence of structures on Sulphide North or the planned structures in Cedarside Plats in 1947 do not support the logical inference that a residence could be built on Sulphide South roughly sixty-eight years later. Even if some miners occupied a "camp" at Sulphide South for a time, there is no proof that their habitation was continuous throughout the five-year prescriptive period. "The right gained by prescription is always confined to the right as exercised for the full period of time required by the statute, which is, in this state, five years." *Loosli v. Heseman*, 66 Idaho 469, 481, 162 P.2d 393, 399 (1945). There is no support in the record for the view that a residence built in 2015 when Latvala purchased this property, would have been reasonably foreseeable to the servient estates between 1946 and 1954.

Ultimately, where Latvala plans to transport materials and men down South Camp Bay Road for the construction of a road and a home on Sulphide South, such a use diverges from how Sulphide South has been used throughout time – an undeveloped parcel, underneath which a mineshaft exists. The district court found that the uses proposed by Latvala are no more burdensome or outside the scope of use as that used by Thomason at the mine during the prescriptive period. Admittedly, men, ore shipments, and mining equipment accessed the sulphide claim by South Camp Bay Road. That said, "[t]he scope of a prescriptive easement is fixed by the use made during the prescriptive period." *Beckstead*, 146 Idaho at 64–65, 190 P.3d at 883–84; *see also Gibbens*, 98 Idaho at 638, 570 P.2d at 875 (quoting *Bartholomew v. Staheli*, 86 Cal.App.2d 844, 850, 195 P.2d 824, 828–29 (1948) ("The scope of a prescriptive easement is determined by the use through which it is acquired. A person using the land of another for the prescriptive period may acquire the right to continue such use, but does not acquire the right to make other uses of it."). We strictly construe these prescriptive easement rights and the burden that would be placed on the servient estates during the construction phase of this project. *Beckstead*, 146 Idaho at 64, 190 P.3d at 883. Thus, we hold that using South Camp Bay Road to construct a residence on

---

[3] In 1954, the mine lessee's DMEA application included the following statement in support: "**Roads built directly to mine entrances**. Distance to Smelter at Kellogg, Idaho is 75 miles, Distance to supplies and *residence* is 18 miles." (Emphasis in original). This is the only direct evidence that a residence for miners existed during the prescriptive period. All other references only mention a "camp."

Sulphide South and a new road across Sulphide North is beyond the scope of the prescriptive easement and, accordingly, reverse that portion of the district court's decision.

### C. We vacate the district court's award of costs to Latvala as the prevailing party.

The Appellants' final argument on appeal is that the district court erred in awarding costs to Latvala because the final judgment was in error. The district court awarded Latvala costs as the prevailing party under Idaho Rule of Civil Procedure 54(d). Rule 54(d)(1)(B) gives a trial court discretionary authority "[i]n determining which party to an action is a prevailing party and entitled to costs." Below, the district court found that Latvala was the prevailing party, having prevailed in his claims for easements over South Camp Bay Road and Sulphide North. Because we have reversed the district court's decision over the scope of the prescriptive easement, we vacate the award of costs to Latvala. However, we note that when a party to an action has only partially prevailed, the district court "may apportion the costs between and among the parties in a fair and equitable manner after considering all of the issues and claims involved in the action and the resulting judgment or judgments obtained." I.R.C.P. 54(d)(1)(B). Latvala still prevailed in part; thus, we remand the case so that the district court can make a new determination of the award of costs reflecting the outcome of the case.

### D. The district court must consider Latvala's claim concerning whether South Camp Bay Road is a public road on remand.

The district court dismissed Latvala's remaining claims: (1) whether South Camp Bay Road is a public road; and (2) whether condemnation of an easement under Idaho's mining laws, I.C. § 47-903 is proper. On cross-appeal, Latvala argues that these issues are entitled to a decision on the merits if the Court reverses the final determination of the district court about the easements. First, Latvala claims he would be entitled to a decision on whether South Camp Bay Road is a public road. Latvala seeks to prove by historical records and uses that South Camp Bay Road was intended as a public road much like Camp Bay Road. Because we have reversed the district court's determination on the scope of the prescriptive easement over South Camp Bay Road, we remand this issue to the district court.

Second, Latvala argues he is entitled to a decision on his claim for condemnation of an easement under Idaho's mining laws, I.C. § 47-903. Section 47-903 states:

> When the owner, claimant or occupant or [of] any mine or mining claim desires to work the same, and it is necessary, to enable him to do so successfully and conveniently, that he have a right of way for any of the purposes mentioned in the

22

foregoing sections, if such right of way cannot be acquired by agreement with the claimant or owner of the lands or claims over, under, through, across or upon which he seeks to acquire such right of way, he may commence an action in the district court in and for the county in which such right of way, or some part thereof, is situated, by filing a verified complaint containing a particular description of the character and extent of the right sought, a description of the mine or claim of the plaintiff, and of the mine or claim and lands to be affected by such right of way or privilege, with the name of the occupant or owner thereof. He may also set forth any tender of compensation that he may have made, and demand the relief sought.

This statute governs easements and access for the development of mines in Idaho. *See id.* While Latvala has shown interest in gathering minerals for his personal use, the record and briefing is clear that Sulphide South is to be a residential property on Lake Pend Oreille. Therefore, Idaho Code section 47-903 cannot grant Latvala access to develop a private residence simply because half of Sulphide South is located on a historical mining claim. Indeed, "[t]his Court has never held that private individuals may take the property of other private individuals in order to enhance their purely private enjoyment of their property." *Cohen v. Larson*, 125 Idaho 82, 84, 867 P.2d 956, 958 (1993) (addressing eminent domain). This claim is, therefore, of no avail to Latvala on remand.

### E. No Attorney Fees and Costs on Appeal

Latvala argues he is entitled to attorney fees and costs on appeal under Idaho Code section 12-121, which permits a court to fees "[i]n any civil action, . . . when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." Although we did not ultimately agree with all of the Appellants' arguments, they prevailed in part. In addition, the Appellants raised key questions of prescriptive uses and the scope of the easements, particularly as ruled upon in the district court's final judgment. The Appellants' arguments were grounded in both fact and law in a good faith attempt to protect their properties from a common law doctrine that acts as a penalty against them and makes their real property servient to Sulphide South. Accordingly, we decline to award Latvala attorney fees on appeal.

### V. CONCLUSION

We affirm the district court's determination that the use of the road at issue by Latvala's predecessors in interest during the active mining years (1946 to 1954) created a prescriptive easement; however, we reverse the district court's judgment expanding the scope of the easement. We vacate the district court's award of costs to Latvala as the prevailing party and remand the case

so that the district court may consider Latvala's remaining claim about whether South Camp Bay Road is a public road. We award no costs or attorney fees to either party on appeal.

Justices BURDICK, BRODY, STEGNER and MOELLER, CONCUR.