8 P.3d 1245

**Norman SOWARDS and Mary Sowards, Plaintiffs–Appellants,**

v.

**Wayne RATHBUN and Mildred Rathbun, husband and wife, and John Does 1 through 10, inclusive, Defendants–Respondents.**

No. 24876.

Supreme Court of Idaho, Pocatello, May 2000 Term.

July 19, 2000.

Rehearing Denied Sept. 22, 2000.

McGrath, Marotz & Smith, Idaho Falls for appellants. Bryan D. Smith argued.

Hopkins, Roden, Crockett, Hansen & Hoopes, Idaho Falls, for respondents. David H. Shipman argued.

WALTERS, Justice.

This is an action seeking damages allegedly resulting from a fraudulent misrepresentation arising out of the purchase of a farm in Butte County. After a trial to the court, judgment was entered for the defendant-sellers, dismissing the plaintiffs' complaint. This district court also awarded attorney fees to the prevailing defendants under the terms of the contract of sale. We affirm the judgment, but we set aside the award of attorney fees.

### BACKGROUND AND PRIOR PROCEEDINGS

Norman and Mary Sowards purchased a farm in Butte County from Wayne and Mildred Rathbun in 1993. In the Spring of 1994, the Sowardses experienced problems with an irrigation well that was used to supplement the farm's surface water rights. They believed that the Rathbuns had misrepresented the condition of the well and filed an action against the Rathbuns for fraudulent concealment, fraudulent misrepresentation, and violation of the Idaho Consumer Protection Act. Following a bench trial on April 16, 1998, the district court made the following findings of fact:

1. In 1971, defendants Wayne and Mildred Rathbun (Rathbuns) purchased a farm (farm) consisting of approximately 210 acres, located in Butte County, Idaho, from Willard Bell (Bell).

2. In about 1955, Bell had an irrigation well drilled on the farm. The well was drilled to a depth of about 110 feet and was lined with 16–inch casing. The bowls were set at a depth of about 40 feet. While he owned the farm, Bell operated it himself and also, at some point, leased the farm to his brother-in-law. As long as Bell operated the farm, the irrigation well produced adequate water for his needs. Bell did not place a 14–inch liner inside the well.

3. After the Rathbuns purchased the farm, they operated it themselves until they retired in 1989. During the time that

704

the Rathbuns were operating the farm, Wayne Rathbun (Rathbun) made no repairs to the irrigation well and did not check the depth of the well. The only maintenance he performed on the well was to add oil to the well pump. Rathbun did not place a 14–inch liner in the well. During the time that the Rathbuns were operating the farm, the irrigation well produced sufficient water to irrigate the farm when used in conjunction with the water obtained through decreed water rights and storage water rights appurtenant to the farm. The Rathbuns never exhausted the decreed and storage water before beginning to use water from the irrigation well.

4. In 1989, the Rathbuns moved to Washington state and leased the farm to L. Vaughn Jensen and Jay Jensen (Jensens). The Jensens leased the farm from the Rathbuns until 1993.

5. In the late 1980s and early 1990s there was a drought in eastern Idaho. The area affected by the drought included Butte County, Idaho, where the farm is located.

6. In 1989, 1990, and 1991, the irrigation well, used in conjunction with the farm's decreed and storage water, produced adequate water to irrigate the farm. The Jensens, like the Rathbuns before them, never exhausted the decreed and storage water before beginning to use water from the irrigation well

7. In 1992, the irrigation well began to cavitate. The Jensens informed Rathbun of the problem they were having with the irrigation well and that the well was not producing a satisfactory amount of water. Rathbun authorized the Jensens to attempt to lower the bowls in the well.

8. The Jensens hired a local company to pull the pump, column, tube, and shaft in order to lower the bowls in the well. They determined that the bowls were already close to the bottom of the well and could not be lowered any further. The Jensens then hired a well-drilling company to lower a video camera down the well to determine its condition. The video camera revealed that the well was approximately 98 feet deep and also that inside the well's 16–inch casing was a 14–inch liner which extended from a depth of approximately 53 feet to the bottom of the well. Because the ma-

jority of the 14–inch liner was not perforated, the flow of water into the well was restricted by the liner. The Jensens continued to use the well for the rest of the season but it did not produce enough water to irrigate the entire farm.

9. The Jensens told Rathbun, who was living in Washington state, that the bowls could not be lowered because they were already near the bottom of the well. The Jensens also told Rathbun that a video camera had been used to examine the well and that a video tape of the inside of the well had been made. Rathbun understood from his conversations with the Jensens that the well casing was broken; he did not know of the presence or condition of the 14–inch liner. Rathbun decided not to deepen the irrigation well because of the expense, and also because doing so might have adversely affected the domestic wells in the area. However, as the landlord, Rathbun paid for the attempt to lower the bowls. Rathbun did not see first-hand the problems that the Jensens were having with the well and believed that, despite those problems, the Jensens were able to irrigate the entire farm.

10. In 1993, the Jensens were concerned that the irrigation well would not produce enough water to irrigate the entire farm that season. Rathbun agreed to reduce the rent on the farm in view of the fact that the Jensens would not be able to irrigate the entire acreage. To this end, Rathbun and the Jensens executed an addendum to the lease for the farm which reduced the number of acres the Jensens agreed to lease from 200 to 121. Of the remaining acres, Rathbun placed 67 acres in a set-aside program administered by the United States Department of Agriculture and was paid approximately $29 per acre for the 67 acres during that year.

11. In 1993, the Jensens gave the Rathbuns notice that they no longer intended to lease the farm.

12. Sometime in 1993, Norman Sowards (Sowards) learned from his parents, whom the Rathbuns had visited during the summer, that the Rathbuns might be interested in selling the farm. In the fall of 1993, but before October 30, 1993, Sowards placed a telephone call to Rathbun and

expressed his interest in purchasing the farm. On October 30, 1993, Rathbun himself placed a call to Sowards to discuss the sale of the farm.

13. In the course of these conversations, Rathbun described the general layout of the farm and what equipment would be included in its sale.

14. Following these telephone conversations with Rathbun, Sowards personally inspected the farm on two occasions. On the first occasion, Sowards inspected the farm alone and spoke to L. Vaughn Jensen. Sowards did not discuss the farms irrigation system with either L. Vaughn Jensen or Jay Jensen. On the second occasion, Sowards inspected the farm with Mike Fallert, who worked for Sowards's parents on their nearby farm. On neither occasion did Sowards test the irrigation well.

15. After Sowards's two inspections of the farm, he and Rathbun spoke a third time by telephone regarding the sale of the farm. By the end of this telephone conversation, Sowards and Rathbun discussed and agreed (a) that the sale price for the property would be $150,000; (b) that the interest rate would be 7.5%; and (c) that Ryan Boyer (Boyer), an attorney with an office in Idaho Falls, Idaho, would draft the documents required for the sale.

16. Rathbun did not represent to Sowards during any of the foregoing discussions that the irrigation well was 150 feet deep, that the irrigation well would produce sufficient water to irrigate the entire farm, or that the irrigation well had produced an adequate supply of water during the time that he had owned the farm.

17. On January 14, 1994, the Rathbuns and the Sowards signed a Real Estate Purchase and Sale Agreement drafted by Boyer. The agreement set out the terms of the sale previously agreed upon by Sowards and Rathbun. The agreement also contained an "as is" clause which provided that the seller had made no representations regarding the property and the buyer had relied upon no such representations:

> 15.1 *False Representation—Warranties:* It is mutually understood and agreed that the Buyer is purchasing said property AS IS, AND THAT THE SELLER HAS MADE NO REPRESENTATIONS REGARDING THE SAID PROPERTY. The Buyer further states that he has inspected said property and the same are being purchased by him only as the result of said inspection, and not by any representations made by the Seller or Seller's agents and/or attorneys. Seller however, does warrant that he holds marketable title and will defend the same.

18. Sowards is, and was at the time of the sale, a relatively sophisticated business man, having extensive property holdings. Sowards understood the purchase and sale agreement in general, and understood the "as is" clause in particular.

19. In the spring of 1994, Sowards planted 100 acres of the farm in new alfalfa seeding with a cover crop of oat hay.

20. The decreed and storage water lasted until the middle or end of June, 1994. At that point, Sowards began using the irrigation well. The well produced an adequate amount of water for approximately one week. The well then began to cavitate. Sowards had the output from the well tested and learned that it was producing about 750 gallons per minute, less than half of the 1,800 gallons per minute the well was licensed for.

21. Sowards hired a pump company to lower the bowls in the well. Workers from the pump company determined that the bowls were already near the bottom of the well and could not be lowered any further.

22. Sowards then hired Doug Hendricks (Hendricks), a licensed well driller, to clean out the well which he believed was filled in with sediment. Hendricks attempted to clean out the well using equipment designed for 16-inch well casings, but could not reach the bottom of the well because of an obstruction at a depth of approximately 53 feet. (At that time, neither Hendricks nor Sowards knew of the presence of the 14-inch liner in the well.) Hendricks then attempted to clean out the well using equipment designed for 14-inch well casings and was able to pass the obstruction which he thought was a break in the 16-inch casing which had slipped out of alignment. He was able to remove sediment for approximately 5 feet at the bot-

tom of the well. At that point he determined that he had reached the bottom of the well—at a depth of about 103 feet.

23. Sowards then instructed Hendricks to lower the well to a depth of 220 feet using 12-inch casing, which they thought would pass the obstruction previously encountered at 53 feet.

Hendricks was able to drive the 12-inch casing past the obstruction to a depth of about 85 feet. where it became stuck. All efforts to remove the 12-inch casing have failed.

24. Although it now has a 12-inch casing lodged inside a 14-inch liner inside the well's original 16-inch casing, the irrigation well is able to function to the same extent that it did before Sowards purchased the farm.

25. Sowards used the well for the remainder of the 1994 growing season even though it did not produce sufficient water to irrigate all the crops on the farm.

26. Sowards had a total crop loss of $18,209.00 for 1994, and expended a total of $7,558.95 in his attempts to lower the bowls in the well and then to deepen the well to 220 feet.

Based upon these findings of fact, the court dismissed the Sowardses' complaint and awarded attorney fees and costs to the Rathbuns. The Sowardses appealed.

### ISSUES ON APPEAL

I. Whether the court erred in finding that Mr. Rathbun did not state that the irrigation well was 150 feet deep and that it produced more than enough water to irrigate the entire farm.

II. Whether the court erred in concluding that the Rathbuns had no duty to ·disclose information regarding the irrigation well.

III. Whether the court erred in awarding costs and attorney fees to the Rathbuns.

### ANALYSIS

### I.

**The district court's findings of fact.**

The district court found that Rathbun and Norman Sowards had spoken on the phone three different times regarding the farm. However, Rathbun testified that he could only recall speaking with Sowards on the phone one time. The district court also made finding of fact 16, which states:

> 16. Rathbun did not represent to Sowards during any of the foregoing discussions that the irrigation well was 150 feet deep, that the irrigation well would produce sufficient water to irrigate the entire farm, or that the irrigation well had produced an adequate supply of water during the time that he had owned the farm.

Thus, the court accepted Sowards' testimony regarding the number of phone calls, but rejected his testimony regarding the substance of those calls. Based upon these findings the district court concluded that "the Sowards have not proven their cause of action for an intentional misrepresentation. In particular, the Sowards have not proven by clear and convincing evidence that any representation regarding the depth of the irrigation well or the adequacy of the water it produced to irrigate the farm was ever made."

 As the district court stated, the party alleging intentional misrepresentation or fraud has the burden of proving the elements of fraud by clear and convincing evidence. *G & M Farms v. Funk Irrigation Co.,* 119 Idaho 514, 808 P.2d 851 (1991). Whether the required burden of proof on a particular issue has been met is a question for the trier of fact to decide in the first instance inasmuch as that court has primary responsibility for weighing evidence. *County of Canyon v. Wilkerson,* 123 Idaho 377, 848 P.2d 435 (Ct.App.1993). The trial court's determination that a claim has not been proven is entitled to great weight on appeal. *Id.* This Court's review of a trial court's decision is limited to ascertaining whether the evidence supports the findings of fact and whether the findings of fact support the conclusions of law. *Conley v. Whittlesey,* 133 Idaho 265, 985 P.2d 1127 (1999); *Alumet v. Bear Lake Grazing Co.,* 119 Idaho 946, 812 P.2d 253 (1991). The Supreme Court may not set aside a trial court's findings of fact

unless they are clearly erroneous, this is, unless the challenged finding is not supported by substantial, competent evidence. I.R.C.P. 52(a); *State, Dept. of Health and Welfare, ex rel. Osborn v. Altman,* 122 Idaho 1004, 842 P.2d 683 (1992). The substantial evidence standard for appellate review requires a greater quantum of evidence in cases where the trial court's finding must be supported by clear and convincing evidence, than in cases where mere preponderance is required. *In Interest of Bush,* 113 Idaho 873, 749 P.2d 492 (1988). When reviewing the trial court's findings of fact in a case in which the facts must be established by clear and convincing evidence, the job of the reviewing court is simply to determine whether there is substantial and competent evidence to sustain the finding. *Christensen v. Nelson,* 125 Idaho 663, 873 P.2d 917 (Ct.App. 1994); *Kreiensieck v. Cook,* 108 Idaho 657, 701 P.2d 277 (Ct.App.1985).

■ The Sowardses argue that since Rathbun cannot recall two of the phone calls that the district court found were made, Norman Sowards' testimony must be accepted as the only source of evidence regarding the substance of those calls. Consequently, the Sowardses argue that the district court's findings regarding the substance of the those two calls, in particular finding of fact 16, are not supported by substantial and competent evidence. We disagree.

Rathbun testified that he never told Sowards that the well was 150 feet deep or that the irrigation well by itself would water the entire acreage. Admittedly, Rathbun only recalled one telephone conversation. However, simply because the trial court concluded there were more telephone calls than Rathbun remembered does not mean that the trial court erred in finding Rathbun's recollection of his statements to Norman Sowards more believable. The trial court's findings are supported by substantial and competent evidence.

## II.

### The district court's conclusion concerning duty to disclose.

■ Silence may constitute fraud when a duty to disclose exists. *G & M Farms v.*

*Funk Irrigation Co.,* 119 Idaho 514, 808 P.2d 851 (1991); *Tusch Enterprises v. Coffin,* 113 Idaho 37, 740 P.2d 1022 (1987); *Bethlahmy v. Bechtel,* 91 Idaho 55, 415 P.2d 698 (1966); *Janinda v. Lanning,* 87 Idaho 91, 390 P.2d 826 (1964). A party may be under a duty to disclose: (1) if there is a fiduciary or other similar relation of trust and confidence between the two parties; (2) in order to prevent a partial statement of the facts from being misleading; or (3) if a fact known by one party and not the other is so vital that if the mistake were mutual the contract would be voidable, and the party knowing the fact also knows that the other does not know it. *Bethlahmy, supra.*

The Sowardses argue that the Rathbuns had a duty to disclose the condition of the well because the defective condition of the well was known to the Rathbuns and was not apparent from an examination of the property. The Sowardses also argue that the Rathbuns had a duty to disclose in order to prevent their partial statement of fact from being misleading. We do not agree that the Rathbuns breached a duty to disclose under the facts of this case.

The district court concluded that:

the Sowards have not established the existence of any special relationship of this type between Rathbun and Sowards. In particular, the Sowards have not proven: (a) the existence of a fiduciary relationship between Rathbun and Sowards; (b) that Rathbun made any partial or ambiguous statement which, not elaborated upon, would have been misleading; (c) that Rathbun obtained any information subsequently which would have made a previous representation untrue or misleading; (d) that Rathbun, or anyone else, made a false representation and that Rathbun knew that Sowards would rely on that representation; or (e) that Rathbun knew that Sowards was about to enter into the transaction under a mistake of fact.

■ Our review of the record in this case shows that the trial court's findings are supported by substantial and competent evi-

dence and the court's conclusions of law flow from those findings.

The evidence in this case reveals that the Rathbuns had operated the farm from 1971 until they retired in 1989. During that time the Rathbuns did not make any repairs to the well and performed no maintenance other than adding oil. During the eighteen years that the Rathbuns operated the farm, the irrigation well produced sufficient water to irrigate the farm when used in conjunction with surface water rights. In 1989 the Rathbuns moved to Washington and leased the farm to the Jensens. Despite a drought in the late 1980s and early 1990s, the well produced sufficient water, when combined with surface water, to adequately irrigate the farm during 1989, 1990, and 1991. In 1992, the Jensens informed the Rathbuns that the well was cavitating. The Jensens attempted to lower the bowls of the well, but determined that the bowls could not be lowered any further. The Jensens told the Rathbuns that the bowls could not be lowered, but the Rathbuns believed that the Jensens were still able to irrigate the entire farm. In 1993, the Jensens were concerned that given the ongoing drought the water available on the farm would be insufficient. The Rathbuns agreed to reduce the rent on the farm to reflect the acreage that would not be irrigated. In 1993, the Jensens decided not to renew their lease. Sowards learned from his parents, whose farm is nearby, that the Rathbuns might be interested in selling the farm. Sowards, a relatively sophisticated businessman who owned other agricultural property in the area, visited the farm both alone and accompanied by a Mike Fallert, who worked for Sowards' parents on their nearby farm. Sowards spoke with the Jensens and observed that part of the farm was not being irrigated. Sowards was also aware that other wells nearby were not producing water. After visiting the farm, Sowards called Rathbun in Washington and negotiated a purchase price.

We hold that the district court's determination that the Sowardses failed to show that Rathbun had knowledge of facts regarding the well that he believed were unknown to Sowards is supported by substantial and competent evidence. The district court's

conclusions of law are not inconsistent with the findings of fact. Therefore, we affirm the district court's decision.

## III.

### Attorney fees below.

█ The trial court awarded attorney fees to the Rathbuns under I.C. § 12–120(3), upon a finding that the underlying purchase of the farm constituted a commercial transaction. While there is ample evidence to show that the parties entered into the purchase and sale agreement for commercial purposes, we conclude that the plaintiffs' suit is based upon a tort claim of fraud rather than upon the contractual agreement between the parties. We therefore hold that the trial court's decision was in error with respect to the award of fees, and we vacate the award.

█ This Court has adopted the following test to determine whether an award of attorney fees is warranted under the commercial transaction clause of I.C. § 12–120(3):

[T]he award of attorney fees is not warranted every time a commercial transaction is remotely connected with the case. Rather, the test is whether the commercial transaction comprises the gravamen of the lawsuit. Attorney's fees are not appropriate under I.C. § 12–120(3) unless the commercial transaction is integral to the claim, and constitutes the basis upon which the party is attempting to recover.

*Brower v. E.I. DuPont De Nemours & Co.*, 117 Idaho 780, 784, 792 P.2d 345, 349 (1990).

In this case, the Sowardses' claim is not based upon the agreement. Accordingly, our recent decisions in *Brooks v. Gigray Ranches, Inc.*, 128 Idaho 72, 910 P.2d 744 (1996) and *Spence v. Howell*, 126 Idaho 763, 890 P.2d 714 (1995) are dispositive on this issue. In *Gigray Ranches, supra*, this Court affirmed the denial of attorney fees by the trial court where the basis of the claim was conversion. Although Gigray Ranches had prevailed on a contract claim brought against it as a party, the Court affirmed the denial of fees where the fees attributable to the contract claim could not be separated from a counterclaim asserted by Gigray Ranches seeking damages for the tort of conversion.

In *Spence, supra,* as in this case, the basis of the plaintiffs' claim was also a tort, fraud. Consequently, the award of attorney fees by the trial court was improper under § 12–120(3).

## CONCLUSION

The district court's decision dismissing the Sowardses' complaint is affirmed. The court's decision awarding attorney fees to the Rathbuns is reversed. Because we conclude that the district court correctly determined that the Sowardses failed to prove liability, we need not reach the other issues raised by the Sowardses regarding the extent of their recoverable damages.

Both parties have requested attorney fees on appeal. However, since both have prevailed in part, no attorney fees or costs are awarded on appeal.

Chief Justice TROUT and Justices SILAK, SCHROEDER and KIDWELL concur.