# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 50736

<table>
<tr><td>

In the Matter of the Terteling Trust No 6.<br>
----------------------------------------------------------<br>
JOSEPH L. TERTELING, CAROLYN E. TERTELING, BROOKE J. TERTELING, ALYSSA M. TERTELING, and DARCY A. TERTELING,<br><br>
   Petitioners-Respondents,<br><br>
v.<br><br>
THOMAS J. TERTELING,<br><br>
   Respondent-Appellant,<br><br>
and<br><br>
THOMAS E. TERTELING, in his capacity as sole Trustee and beneficiary of Trust No. 6, and TERTELING FOUNDATION, INC.<br><br>
   Real Party in Interest.

</td><td>

Boise, September 2024 Term<br><br>
Opinion Filed: November 1, 2024<br><br>
Melanie Gagnepain, Clerk

</td></tr>
</table>

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Gerald F. Schroeder, Senior District Judge.

The decision of the district court is <u>affirmed</u>.

Generations Law Group, Boise, for Appellant. Thomas G. Walker argued.

Ferguson Durham, PLLC, Boise, for Respondents. Deborah A. Ferguson argued.

———————————————

BRODY, Justice.

This case concerns the reformation of a trust to remove male beneficiary restrictions and replace them with gender-neutral language to benefit successive generations of the Joseph L. Terteling family. Joseph L. Terteling ("Joseph"), his former wife Carolyn E. Terteling, and their

three granddaughters, Brooke J. Terteling, Alyssa M. Terteling, and Darcy A. Terteling (collectively, "the Petitioners") filed a verified petition to reform Terteling Trust No. 6 ("the Trust") to reflect the alleged original intentions of the five trustors to benefit Joseph's successive generations, regardless of their gender. Thomas J. Terteling ("Thomas J."), a contingent beneficiary of the Trust who is Joseph and Carolyn's grandson, filed an objection to the reformation. He argued that the Petitioners could not demonstrate by clear and convincing evidence that (1) a mistake was made in the drafting of the Trust by including male restrictions, or (2) that it was the intention of *all* the trustors, including Joseph's since-deceased aunt and uncle, to benefit successive generations of the family regardless of gender.

The magistrate court granted the verified petition. The magistrate court concluded that the stipulated facts demonstrated by clear and convincing evidence that a drafting error had occurred in restricting the class of beneficiaries to male children only, and the trustors did not intend to restrict the Trust beneficiaries to only male members of the Terteling family; rather, the Trustors intended to benefit all the children and descendants of Joseph, regardless of gender. Thomas J. appealed to the district court, which affirmed the magistrate court's decision. He now appeals to this Court. For the reasons expressed below, we affirm the district court's decision.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Creation of the Trust

Terteling Trust No. 6 is an irrevocable trust created by a trust agreement on June 30, 1970, by six trustors: Joseph, Carolyn, N.L. Terteling ('Nixon"), Angela B. Terteling, N. Kendal Terteling ("Kendal"), and J.A. Terteling & Sons (collectively, "the Trustors"). Nixon and Angela, husband and wife, were Joseph's uncle and aunt and are now both deceased; Kendal is their son. J.A. Terteling & Sons was an Idaho general partnership in which Joseph, Nixon, and Kendal were general partners. The partnership conveyed all of its assets to the family corporation, J.A. Terteling & Sons, Inc. Subsequently, all of the capital stock in J.A. Terteling & Sons, Inc. was vested in the Trust. The capital stock was Joseph's sole and separate property, which he had inherited from his parents. In exchange for the shares of stock, J.A. Terteling & Sons, Inc. received a promissory note from the Trust for the value of the stock; the note has since been satisfied and discharged.

At its formation, the Trust had three Co-Trustees: Joseph, Nixon, and Kendal. The purpose of the Trust was not to benefit the Trustors or Co-Trustees, but to benefit the Co-Trustees' heirs.

2

Article III of the Trust contained language restricting the class of beneficiaries to male children named Terteling:

> CO-TRUSTEES shall pay the net INCOME of the CORPUS annually in equal shares to, or for the benefit of, each then living male child whose name is TERTELING, and who is the child of one of the CO-TRUSTEES, but is not one of the original CO-TRUSTEES; provided however, that if any said child named TERTELING of one of the CO-TRUSTEES shall have died leaving one or more male children of his own named TERTELING, then said surviving child or children of such deceased child shall be entitled, per stirpes, to the share which such deceased child would have taken if living.

At the time the Trust was created, Joseph was the father of four young boys: Joseph N. Terteling, Andrew J. Terteling ("Andrew"), Steven L. Terteling ("Steven"), and Thomas E. Terteling. Joseph did not have any additional children after the Trust was created, and the other Co-Trustees did not have any other children. Even though Kendal is the son of Nixon and Angela, he was not a beneficiary because he was one of the original Co-Trustees. Nixon hired the attorney who drafted the Trust and "was the driving force regarding the formation of … [the Trust]." Neither Joseph nor Carolyn discussed the language of the Trust with the attorney who drafted it. None of the parties to this appeal have been able to identify the attorney who drafted the original trust agreement.

**B.      1978 dispute, dissolution of J.A. Terteling & Sons, Inc., and the 1978 affidavit**

In 1978, eight years after the Trust was created, Joseph and his sister, Ann Terteling Sparks, filed a lawsuit against Nixon and Kendal for control of the Trust and J.A. Terteling & Sons, Inc. This lawsuit was resolved through a court-approved settlement. As part of that settlement, both Nixon and Kendal resigned as Co-Trustees of the Trust, the partnership, J.A. Terteling & Sons, was dissolved, and the family corporation, J.A. Terteling & Sons, Inc., was restructured and renamed "The Terteling Company, Inc.". The Terteling Company owns all of the shares of Western States Equipment Co., Inc., and the Trust owns all of the shares in The Terteling Company. The 1978 settlement included a provision that Seattle First National Bank (subsequently, Seafirst National Bank, and now Bank of America) ("the Bank") would replace both Nixon and Kendal as Co-Trustees of the Trust; however, Kendal reserved the right to appoint a corporate successor co-trustee from a list of approved financial institutions in the event the Bank resigned or was removed as a corporate co-trustee.

At the time this settlement was reached, the Trust was indebted to Nixon, Angela, Ann Terteling Sparks, Kendal, and Joseph. The settlement provided that these creditors would be

"cashed out" as soon as possible, and at any rate, no later than five years past the date of judgment in that case, with interest. The appointment of a corporate trustee provided assurance to the creditors that the Trust would satisfy its debts as required by the settlement. All creditors were later paid and the Trust's debts were fully discharged as provided in the 1978 Judgment. Within five years of the 1978 Judgment, none of the Trustors were creditors of the Trust.

As part of the Bank's acceptance of its co-trusteeship, it required all of the Trustors to sign an affidavit clarifying their original intent and purpose in establishing the Trust to alleviate concerns regarding diversification of the Trust's assets. On October 17, 1978, all of the Trustors executed an affidavit, including Nixon, Angela, Kendal, Joseph, Carolyn, and J.A. Terteling & Sons Co. (successor in interest to J.A. Terteling & Sons). Nixon signed on behalf of J.A. Terteling & Sons Co., as General Partner. The affidavit stated that the purpose of the Trust was to benefit successive generations of the Terteling family:

> Come Now on this 17th day of October, 1978, N.L. Terteling, N.K. Terteling, and J.L. Terteling, the original Co-Trustees of the Terteling Company (T-6), established by Trust Agreement dated June 30, 1970; and N.L. Terteling and Angela Terteling, J.L. Terteling and Carolyn E. Terteling, N.K. Terteling and J.A. Terteling and Sons, a general partnership, Trustors; being duly sworn, depose and say:
>
> 1. That this Affidavit is hereby made for the purposes of clarifying the original intent in establishing the irrevocable trust agreement dated June 30, 1970, known as "The Terteling Company" (T-6);
>
> 2. *That the original intent of the trustors was retention and management of all the shares of the family corporation known as J. A. Terteling & Sons, Inc., an Idaho corporation, or its successor, within said irrevocable trust for the benefit of successive generations of the family*;
>
> 3. That the Trustors intended at the establishment of said Trust to relieve the Co-Trustees of any duty of diversification absent compelling reason to the contrary[.]

(Emphasis added).

## C.     Birth of Joseph's granddaughters

In 1995, twenty-five years after the Trust was created, and after Nixon and Angela had died, the first female heir of Joseph and Carolyn was born, Brooke J. Terteling. At that time, Joseph realized that the male-restrictive language of the Trust prevented Brooke from being a contingent residual beneficiary, and he discussed this impact with his then wife, Flinda Terteling. They had a similar discussion three years later in 1998, after triplet grandchildren were born: Alyssa, Darcy, and Thomas J. The male restriction would impact all three granddaughters, but not their brother.

4

Joseph sought legal counsel in the late 1990s "to see" if the language in the Trust "could be corrected to provide for the benefit of successive generation of the Terteling family as he intended," but was told that the Trust could not be reformed judicially.

### D.     2013 TEDRA Agreement Modifying the Trust

In 2013, the interested parties—including Joseph and the Bank of America as Co-Trustees, the Trust's beneficiaries, and the virtual representatives of the minor contingent beneficiaries of the Trust—executed a non-judicial binding agreement, pursuant to the Trust and Estate Dispute Resolution Act, Idaho Code section 15-8-101, et. seq. ("TEDRA"), modifying the Trust to reflect the intentions expressed in the 1978 Affidavit regarding the Trust's purpose. The 2013 TEDRA Agreement explained that the original intent of the Trustors was "retention and management of all the shares of the family corporation … within [the Trust] for the benefit of successive generations of the family." The agreement modified Article I of the Trust and provided that the Trust's purpose is to benefit successive generations of the Terteling family:

> It is the Trustors' express intent that the purpose of THE TERTELING COMPANY shall be the retention and management of all the shares of the family corporation known as J.A. Terteling & Sons, Inc., an Idaho corporation, or its successor, within THE TERTELING COMPANY *for the benefit of successive generations of the Terteling family*. Pursuant to Idaho Code § 68- 501(2), this express purpose shall override and displace any duty of the Co-Trustees to diversify the CORPUS with respect to the shares of the family corporation, including but not limited to the duty set forth in Idaho Code § 68-503, and shall exculpate the Co-Trustees from liability for failure to diversify the same, except as expressly provided in Article V of the TRUST AGREEMENT.

 (Emphasis added).

In 2016, Joseph resigned as Co-Trustee pursuant to the terms of the Trust and the 1978 Judgment, and Thomas E. Terteling was appointed as his successor.

### E.     Kendal's fraudulent adoption scheme

In 2020, Kendal, then around 75 years-old, filed a petition to adopt Richard Tinsley, age 66, as part of a scheme to defraud the Trust. An order of adoption was entered on December 31, 2020. Although he is Nixon's male-child, Kendal, as an original co-trustee, could not benefit from the Trust because the Trust specifically excludes him as a beneficiary. After the adoption was final, Richard Tinsley changed his surname to Terteling, then applied to the Bank to be added as a beneficiary for distribution of trust benefits. The Bank informed Trustee Thomas E. Terteling of

5

the demand, who then intervened in the adoption proceeding and obtained a judgment vacating the Order of Adoption *nunc pro tunc*.

During the process of vacating the adoption order, the interested parties learned that a friend of Kendal had rented an apartment in Boise for Kendal so he could claim he was an Idaho resident when in fact he was not. Kendal was a resident of California and had not resided in Idaho for some time; however, he swore under oath in the adoption proceeding that he had been an Idaho resident for six months prior to filing the petition for adoption. Likewise, both Kendal and Richard Tinsley swore under oath in the adoption hearing that Kendal had a parental relationship with Richard Tinsley for one year prior to filing the petition, but this was not true. On June 11, 2021, the adoption court vacated the Order of Adoption upon learning of the parties' perjury. Criminal charges were subsequently filed against the friend, Kendal, and Richard Tinsley for the crimes of preparing false evidence in violation of Idaho Code section 18-2602 and attempted grand theft in violation of Idaho Code section 18-2403. Both Nixon and Richard Tinsley were also charged with the crime of perjury in violation of Idaho Code section 18-5401.

F.      2021 TEDRA Agreement

Around the same time as Kendal's fraudulent adoption attempt, the Trust became aware that its co-trusteeship arrangement placed its construction equipment business, Western States Equipment Company, Inc. ("Western States"), out of compliance with the dealership agreement it had with the Caterpillar company. The dealership agreement required a single individual, named the "Dealer Principal," to maintain exclusive voting control over Western States; accordingly, the Bank sought to resign as Co-Trustee of the Trust, such that Thomas E. Terteling would be the sole trustee with exclusive voting control pursuant to the dealership agreement.

On May 4, 2021, the Trust obtained a judgment striking the portion of the 1978 Judgment referring to Kendal's right to appoint a successor corporate co-trustee upon the Bank's resignation, thereby removing Kendal's remaining rights or interests in the Trust. Kendal opposed this action, but the Ada County Magistrate Court, which entered the judgment, specifically found that Kendal had "no legitimate reason to oppose the deletion" because he was no longer a creditor or a co-trustee, was not a beneficiary or contingent beneficiary of the Trust, and had not been in contact with the family for several decades. Following this judgment, the interested parties of the Trust— including all living Trustors, the Trustee, all beneficiaries and virtual representatives of the contingent beneficiaries, contingent beneficiary the Terteling Foundation, Inc., and contingent

6

beneficiary Thomas J.—executed a non-judicial binding agreement to designate a single trustee who would be the Dealer Principal, and to accept the resignation of the Bank as Co-Trustee. The 2021 TEDRA agreement provided that "[t]he original intent of the Trustors was retention and management of all the shares of the family corporation known as J.A. Terteling & Sons, Inc., an Idaho corporation or its successor, within [the Trust] for the benefit of successive generations of the Terteling family." The 2021 TEDRA agreement also modified Article VI of the Trust to state, "There shall be a sole Trustee, who may be male, female, or gender neutral."

## G.    Course of Proceedings

On February 21, 2022, Joseph, Carolyn, and their granddaughters Brooke, Alyssa, and Darcy filed a verified petition to reform the Trust, along with their declarations. The petition sought to remove the male-only restrictions contained in Article III of the Trust and replace them with gender-neutral language as allegedly intended by the Trustors. None of the current beneficiaries objected to the petition; however, Thomas J., a contingent beneficiary and brother of the three granddaughter petitioners, filed an objection.

The parties submitted a joint stipulation of facts, as well as a joint stipulation of exhibits. Because no facts were in dispute, the parties presented oral argument to the magistrate court, which then granted the verified petition. The magistrate court incorporated all of the stipulated facts as its factual findings, then concluded that the facts demonstrated, by clear and convincing evidence, that a mistake had been made in the drafting of the Trust and the intent of the Trustors was not realized by the language written therein: "The Trustors did not intend to restrict the beneficiaries of the Trust to male members of the Terteling family but rather to provide that beneficiaries may be gender neutral so long as they are the children of or descendants of Joseph L. Terteling." The magistrate court relied on the following evidence for this conclusion: (1) the Declaration of Trustor Joseph L. Terteling; (2) the Declaration of Trustor Carolyn E. Terteling; (3) the Affidavit dated October 17, 1978, that was signed by all of the Trustors; and (4) the 2013 and 2021 TEDRA Agreements. The magistrate court further determined that the unambiguous language of the Trust did not demonstrate the Trustors' intent, and the fact that males may have been considered preferable business managers in 1970 was not persuasive evidence of any individual Trustor's intent. Finally, the magistrate court declared that Trustor Kendal, who was still alive but did not participate in the proceeding, was not credible due to his actions involving the fraudulent adoption scheme, and his efforts to inherit from the Trust by fraudulently adopting a male heir did not

7

demonstrate that the Trust Agreement was mistake-free or that it was the original intent of the Trustors to exclude females as Trust beneficiaries.

Thomas J. appealed the magistrate court's decision to the district court. He argued that the Petitioners did not demonstrate by clear and convincing evidence that the male restrictive language contained in Article III was a mistake or that it was the intent of *all* Trustors, including the deceased Nixon and Abigail, to benefit a gender-neutral class of heirs. The district court affirmed the magistrate court's decision. Thomas J. timely appealed to this Court.

## II.     STANDARDS OF REVIEW

"When reviewing the decision of a district court sitting in its capacity as an appellate court, this Court reviews the trial court record 'to determine whether there is substantial and competent evidence to support the magistrate's findings of facts and whether the magistrate's conclusions of law follow from those findings.'" *Simmons v. Loertscher*, __Idaho __, ___, 551 P.3d 719, ___ (2024) (quoting *Portfolio Recovery Assocs., LLC v. MacDonald*, 162 Idaho 228, 231, 395 P.3d 1261, 1264 (2017)). "Thus, this Court does not review the decision of the magistrate court." *Id*. (quoting *Portfolio Recovery,* 162 Idaho at 231, 395 P.3d at 1264). "Rather, we are 'procedurally bound to affirm or reverse the decision of the district court.'" *Id.* (quoting *Portfolio Recovery*, 162 Idaho at 231, 395 P.3d at 1264).

This Court reviews a trial court's findings in a case requiring clear and convincing evidence to determine whether there is substantial and competent evidence to support the findings:

> "[W]hen reviewing the trial court's findings of fact in a case in which the facts must be established by clear and convincing evidence, the job of the reviewing court is simply to determine whether there is substantial and competent evidence to sustain the finding." *Latvala v. Green Enters.*, *Inc*., 168 Idaho 686, 695, 485 P.3d 1129, 1138 (2021) (quoting *Sowards v. Rathbun*, 134 Idaho 702, 707, 8 P.3d 1245, 1250 (2000)). Evidence is substantial and competent if a reasonable trier of fact could accept and rely upon it in making the factual finding challenged on appeal. *Id*. "However, '[t]he substantial evidence standard for appellate review requires a greater quantum of evidence when the trial court's finding must be supported by clear and convincing evidence, than when mere preponderance is required.' " *Id*.

*Cook v. Van Orden*, 172 Idaho 869, 875–76, 537 P.3d 1230, 1236–37 (2023).

## III.     ANALYSIS

Thomas J. contends that the district court erred in affirming the magistrate court's decision to reform the Trust because the stipulated facts are insufficient to meet the clear and convincing evidence standard required for reformation. For the reasons expressed below, we conclude that the

magistrate court's findings were supported by substantial and competent evidence; accordingly, we find no error in the district court's affirmance of the magistrate court's decision granting reformation of the Trust.

The interpretation of a trust is a question of law. *Houston v. Houston*, 172 Idaho 264, 268, 531 P.3d 1161, 1165 (2023). Under Idaho Code section 15-7-201, the magistrate court has exclusive jurisdiction over registered trusts and the authority "to determine any question arising in the administration or distribution of any trust including questions of construction of trust instruments." I.C. § 15-7-201(a)(3). The Trust is a registered trust in Idaho's Fourth Judicial District, in conformance with Idaho Code section 15-7-201.

Although this Court has not specifically addressed reformation of a trust, we have long recognized that reformation of an instrument is a proper equitable remedy when the evidence demonstrates that the instrument does not reflect the parties' intentions. *Hughes v. Fisher*, 142 Idaho 474, 482, 129 P.3d 1223, 1231 (2005) (reformation of a warranty deed); *Belk v. Martin*, 136 Idaho 652, 658, 39 P.3d 592, 598 (2001) (reformation of a lease); *Collins v. Parkinson*, 96 Idaho 294, 296, 526 P.2d 1252, 2354 (1974) (reformation of a deed). Generally, reformation of an instrument requires a finding of a mutual mistake, or a unilateral mistake combined with evidence that the other party had knowledge of the mistake. *Belk*, 136 Idaho at 658, 29 P.3d at 598. However, trusts differ from many other written instruments because trustors typically do not receive consideration for the creation of a trust. *See* Mary F. Radford, *Consideration in modern trust law*, *in* § 202 BOGERT'S THE LAW OF TRUSTS AND TRUSTEES (July 2024 update); RESTATEMENT (THIRD) OF TRUSTS: RECISSION AND REFORMATION § 62, cmt. a (July 2024 update). Accordingly, "a unilateral mistake on the part of the settlor is ordinarily sufficient to warrant reformation." *Carlson v. Sweeney, Dabagia, Donoghue, Thorne, Janes & Pagos*, 895 N.E. 2d 1191, 1199 (Ind. 2008) (citing 4A. SCOTT, TRUSTS § 333.4 (4th ed. 1987)); RESTATEMENT (THIRD) OF TRUSTS: RECISSION AND REFORMATION § 62 cmt. a.

Reformation is a matter of trust construction in which the trustor's intent at the time of the trust's creation is of utmost importance. *See* Mary F. Radford, et. al., *Reformation of Trust Instrument*, *in* § 991 BOGERT'S THE LAW OF TRUSTS AND TRUSTEES (July 2024 update). When a trust is reformed, it "is reworded to correct a mistake made by the settlor or a scrivener so that the trust reflects the settlor's actual intent at the time the trust was drafted." *Id*., n.1. The Restatement Third of Property addresses when trust reformation is appropriate. RESTATEMENT (THIRD) OF

9

PROP.: WILLS AND DONATIVE TRANSFERS § 12.1. Under the Restatement approach, inter vivos trusts, like deeds, life insurance contracts, and other donative documents, can be reformed if it is established by clear and convincing evidence: "(1) that a mistake of fact or law, whether in expression or inducement, affected specific terms of the document; and (2) what the donor's [or trustor's] intention was." *Id.*, cmt. c.

Reformation of a trust "to conform the terms to the settlor's intention" is also recognized under the Uniform Trust Code, even when the terms of the trust are unambiguous. UNIF. TR. CODE § 415 (Unif. L. Comm'n 2023). Unlike trust interpretation to resolve ambiguity, which "involves the interpretation of language already in the instrument[,]" reformation "may involve the addition of language not originally in the instrument, or the deletion of language originally included by mistake, if necessary to conform the instrument to the settlor's intent." *Id.*, cmt. ¶ 3. Accordingly, "reliance on extrinsic evidence is essential." *Id.*

Thomas J. raises two arguments in support of his contention that clear and convincing evidence cannot establish that the male-only beneficiary restriction was a mistake or that the intent of the Trustors was to provide for gender-neutral beneficiaries. He first argues that the Trust Agreement's unambiguous usage of male-restrictive language multiple times throughout the document demonstrates that the male-only beneficiary designation was not a mistake. Second, he argues that there is a lack of substantial and competent evidence to support the magistrate court's finding that *all* Trustors, most notably the deceased Nixon and Abigail, did not intend to restrict the Trust's beneficiaries to male children only but intended to benefit gender neutral heirs. Each argument is addressed in turn.

**A.      The Trust Agreement's unambiguous designation of male-only beneficiaries multiple times throughout the document does not preclude trust reformation.**

Thomas J. argues that the unambiguous usage of "male" at several points throughout Article III, along with the Trustors' signatures on each page of the Trust Agreement, is conclusive evidence that the Trust's restriction of benefits to male children only was not a mistake and was in fact the original intent of the Trustors. He argues that there "is a lack of evidence to show that none of the Trustors [excluding Joseph and Carolyn] read or understood the Trust Agreement when they signed it," which he suggests is required under *Liebelt v. Liebelt*, 118 Idaho 845, 849, 801 P.2d 52, 56 (Ct. App. 1990). This argument is unavailing.

Reformation of a trust does not depend upon ambiguity within the trust document. RESTATEMENT (THIRD) OF TRUSTS § 62, cmt. b (2003). Trusts may be reformed even when

10

unambiguous. *Id*. "Even if the will or other instrument creating a donative testamentary or inter vivos trust is unambiguous, the terms of the trust may be reformed by the court to conform the text to the intention of the settlor if the following are established by clear and convincing evidence: (1) that a mistake of fact or law, whether in expression or inducement, affected the specific terms of the document; and (2) what the settlor's intention was." RESTATEMENT (THIRD) OF TRUSTS § 62 (2003). As explained by the Indiana Supreme Court in *Carlson v. Sweeney*, "most trust instruments are drafted by counsel, and the language in the instrument is the testator's only by adoption." 895 N.E. 1191, 1200 (Ind. 2008). "[T]he testator informs counsel what she wants to accomplish and relies on counsel to carry out her wishes. If counsel makes a mistake in drafting and fails in this effort, then the testator's intent has not been realized." *Id*. If counsel wrote a mistake into the trust document, the trustor's intent would not be realized no matter how many times that same mistake appears in the trust instrument. Therefore, we find Thomas J.'s argument on this point unavailing.

Thomas J.'s reliance on the Court of Appeals' decision in *Liebelt* is misplaced. *Liebelt* did not concern reformation of a donative instrument, nor did it concern a trust. 118 Idaho at 846, 901 P.2d at 53. *Liebelt* concerned enforcement of a prenuptial agreement, which a wife attempted to avoid by challenging the validity of the agreement in a divorce proceeding. *Id*. at 848, 901 P.2d at 55. A prenuptial agreement is, in essence, a contract; accordingly, contract law generally applies to its enforceability. *See id*. The magistrate court invalidated the prenuptial agreement, presumably based upon a theory of duress or potentially undue influence, but the Idaho Court of Appeals determined that the magistrate court's findings of fact were insufficient to reach that conclusion and reversed and remanded the case for further proceedings. *Id*. at 850, 901 P.2d at 57. The Idaho Court of Appeals also noted that a general allegation that the wife failed to understand the agreement when she signed it was insufficient grounds to void the contract because "failing to read the contract or to have it read to [her] or otherwise inform h[er]self as to the nature, terms and conditions of the contract constitutes nothing more than gross negligence on the part of the party and is an insufficient ground upon which to set the contract aside." *Id*. at 848–49, 801 P.2d at 55–56.

Contract enforceability and trust reformation are not comparable legal concepts. A trust is distinguishable from a contract because there is typically no consideration given by a beneficiary in exchange for the Trustor creating the trust. *See* Mary F. Radford, et. al., *Consideration in modern trust law*, *in* § 202 BOGERT'S THE LAW OF TRUSTS AND TRUSTEES (July 2024 update);

11

RESTATEMENT (THIRD) OF TRUSTS: RECISSION AND REFORMATION § 62, cmt. a, *supra*. In addition, reformation is a matter of instrument construction—by ensuring that mistakes are corrected such that the instrument reflects the testator/trustor's original intent. UNIF. TR. CODE § 415 (Unif. L. Comm'n 2023). Thus, the contract principle that a party cannot avoid enforceability of a contract by alleging a failure to fully understand the impact of the contract signed is not applicable to trust reformation. Moreover, contrary to Thomas J.'s contention, failure to read an instrument or notice that it contained a mistake *can* be a basis for reformation, even when the instrument at issue is a contract. *See, e.g., Belk v. Martin*, 136 Idaho 652, 658, 39 P.3d 592, 599 (2001) (affirming reformation of lease based upon the lessor's unilateral mistake known by the lessee, even though the mistake was the product of the lessor's negligence in failing to read the lease).

In sum, the unambiguous language in Article III restricting beneficiaries to male children only and the usage of "male child" at multiple points in the document do not preclude reformation of the Trust.

**B.      Substantial and competent evidence supports the magistrate court's findings that the Trust Agreement's designation of male-only beneficiaries was a mistake and that the original intent of the Trustors was to provide for gender neutral beneficiaries**.

The magistrate court ordered reformation of the Trust after concluding that the stipulated facts demonstrated, by clear and convincing evidence, that a mistake occurred in the drafting of Article III and that "[t]he Trustors did not intend to restrict the beneficiaries of the Trust to male members of the Terteling family but rather to provide that beneficiaries may be gender neutral[.]" In anticipation of trial, the parties submitted joint stipulated exhibits and a joint stipulation of facts. The parties agreed each fact in in the stipulation was uncontested and that no proof at trial was necessary. The magistrate court adopted the parties' joint stipulation of facts as its factual findings and concluded that the uncontested declarations of Joseph and Carolyn, the 1978 affidavit, and the 2013 and 2021 TEDRA Agreements provided the clear and convincing evidence necessary to reform the trust:

> The stipulated facts demonstrate clear and convincing evidence that a mistake occurred in the drafting of Article III of the Trust Agreement. The Trustors did not intend to restrict the beneficiaries of the Trust to male members of the Terteling family but rather to provide that beneficiaries may be gender neutral so long as they are the children of or descendants of Joseph L. Terteling. Such evidence includes (1) the Declaration of Trustor Joseph L. Terteling; (2) the Declaration of Trustor Carolyn E. Terteling; (3) the 1978 Affidavit dated October 17, 1978 that is signed by all of the original Trustors; and (4) the 2013 and 2021 TEDRA Agreements.

12

…

> [Thomas J.] essentially argues that the language of the Trust alone demonstrates the Trustors' intent. In light of the uncontroverted evidence presented by the Petitioners, the language alone does not demonstrate the Trustors' intent.

(Internal citations omitted).

On intermediate appeal, the district court reviewed the record to determine whether the magistrate court's factual findings were supported by substantial and competent evidence, then analyzed whether such findings could support the magistrate court's conclusions of law regarding the drafting error in the Trust Agreement and the Trustors' intent. *See Collins v. Parkinson*, 98 Idaho 871, 574 P.2d 913 (1978). In doing so, the district court provided a greater explanation of how the evidence establishes that a mistake was written into the Trust Agreement and that the Trustors' original intent was to benefit a gender-neutral class of heirs:

> There is no evidence beyond the face of the trust that it was the intent of the trustors to restrict beneficiaries to males. There is substantial, competent evidence to support reformation of the trust. The trust corpus derives from Joseph's sole and separate property. He states that the intent was to give the property to all generations of the family, regardless of gender, and the male-only designation was an error. There were no female heirs at that time or for many more years. Joseph attempted to change the trust after the first female granddaughter was born, realizing that she would not benefit under the language of the trust. Carolyn would not have agreed to the restriction had she known it was in the trust. The 1978 affidavit and TEDRA agreements support the claim that males and females were intended to be included as beneficiaries of the trust. No reason for a male only restriction has been shown. There is clear and convincing evidence that the restriction was a mistake and that Article III of Terteling Trust No. 6 should be reformed to eliminate the male only restriction.

On review, this Court's role is limited to determining whether a reasonable trier of fact could accept and rely upon those same pieces of evidence to satisfy the legal requirements for reformation of a trust. *See Cook v. Van Orden*, 172 Idaho 869, 876, 537 P.3d 1230, 1237 (2023). We agree with the district court's conclusion that the magistrate court's findings derived from Joseph's and Carolyn's declarations and the 1978 Affidavit support the magistrate court's decision to reform the Trust.

First, Joseph's and Carolyn's declarations both state that the male-only designation in the Trust Agreement was a drafting error that did not reflect their true intentions at the time the Trust was created. Joseph's declaration states that "the intent was to give the Trust property to all generations of his family, regardless of gender, and the male designation was error." Carolyn's

13

declaration reflects this same intent, and further states that she "depended on [the attorney who drafted the Trust Agreement] to achieve our intent" and "would not have agreed to the male restriction in Trust No. 6 and did not know that this discriminatory language excluded [her] future granddaughters from being beneficiaries." No evidence was presented to contradict Joseph's and Carolyn's testimony regarding their intent at the time of the Trust's formation. "A trier of fact may not arbitrarily disregard credible and unimpeached testimony of a witness .... [U]nless a witness's testimony is inherently improbable, or rendered so by facts and circumstances disclosed at trial, the trier of fact must accept as true the positive, uncontradicted testimony of a credible witness." *Cook v. Van Orden*, 170 Idaho 46, 57, 507 P.3d 119, 130 (2022) (alterations in original) (quoting *Wood v. Hoglund*, 131 Idaho 500, 703, 963 P.2d 383, 386 (1998)). Accordingly, a reasonable trier of fact could accept and rely on Joseph's and Carolyn's declarations as conclusive evidence of their intent, as Trustors, at the time of the Trust's creation, to benefit not just males as the Trust Agreement stated, but *all* successive generations of his family, regardless of gender.

Joseph's declaration also demonstrates that he attempted to correct the mistake soon after it became apparent, when the granddaughters were born in the 1990s:

> We sought legal counsel in the late 1990s to see if the language of Trust No. 6 could be corrected to provide for the benefit of successive generations of the Terteling family as it was intended to do and were told we could not correct this error. We more recently sought a second opinion and were informed we could petition the Court to reform the Trust to reflect our true intentions as Trustors. I did not pursue this course of action earlier as I had been informed it was not possible to do so.

A reasonable trier of fact could conclude that Joseph's and Carolyn's testimonies regarding the Trustors' intent at the time of the Trust's creation are credible because they attempted to correct the mistake as soon as at it was realized. The magistrate court's findings are further supported by Joseph's testimony that he has dyslexia and does not recall reading the entire Trust Agreement at the time of signing and Carolyn's testimony that she did not speak to the attorney who drafted the Trust Agreement, and the "technical language of the Trust" was never explained to her. Thus, a reasonable trier of fact could conclude that the evidence does not demonstrate a new or changed intent since the time of the Trust's creation; rather, Joseph's and Carolyn's intent to benefit successive generations of the family extends back to the date of the Trust's creation.

Second, the 1978 Affidavit, by itself, but particularly when combined with Joseph's and Carolyn's affidavits, is substantial and competent evidence that all Trustors intended all subsequent generations of the family, regardless of gender, to be included as beneficiaries of the

14

Trust. The 1978 affidavit was signed by all of the Trustors and states the original intention of the Trustors in creating the Trust:

> That the original intent of the Trustors was the retention and management of all the shares of the family corporation known as J.A. Terteling & Sons, Inc., an Idaho corporation, or its successor, within said irrevocable trust *for the benefit of successive generations of the family*.

(emphasis added). The phrase "for the benefit of successive generations of the family" is, on its face, gender neutral. The gender of family members in "successive generations" is unknown because "successive generations" is an open class of un-ascertainable heirs. Thus, by 1978, just eight years after the Trust was created and when all ascertainable heirs were male, all Trustors, including Nixon and Angela, declared that their original intent in 1970 was to benefit successive generations of the family. A reasonable trier of fact could conclude that, had the male restriction actually been intended, the clarification of intent in the 1978 Affidavit would have kept the same language as Article III.

Thomas J. argues that, because the 1978 Affidavit was not made for the purpose of modifying Article III but was made to assure the Bank that the Trustors did not want to diversify the Trust's assets, the 1978 Affidavit cannot constitute evidence of the Trustors' intent in creating the Trust. We disagree. The affidavit itself declares its purpose: "That this Affidavit is hereby made *for the purposes of clarifying the original intent* in establishing the irrevocable trust agreement dated June 30, 1970, known as 'The Terteling Company.' " (emphasis added). That "the Trustors intended to relieve the Co-Trustees of any duty of diversification" is *one* aspect of the Trustors' original intent; however, the Affidavit demonstrates that the original intent was much larger than that one aspect. Diversification of trust assets was not intended *precisely because* the purpose of the Trust was "retention and management of all the shares of [stock in] the family corporation… *for successive generations of the family*." (emphasis added). Accordingly, on its face, the 1978 Affidavit expresses the Trustors' original intent in creating the Trust, which was to provide for a gender-neutral class of beneficiaries. Therefore, even apart from the other evidence, a reasonable trier of fact could rely on the 1978 Affidavit as clear and convincing evidence that (1) the male restrictive language in Article III was a mistake, and (2) the Trustors' intent was to benefit successive generations of the family, regardless of gender.

As a final argument in support of his contention that the district court erred in affirming the magistrate court's decision granting reformation of the Trust, Thomas J. challenges the district

15

court's statement that "[t]he Trust corpus derives from Joseph's sole and separate property[,]" arguing that it is not supported by substantial and competent evidence in the record because the other Trustors may have also contributed property to the Trust. But Thomas J.'s argument misses the point of appellate review. While we are procedurally bound to affirm or reverse the district court's decision, it is the *magistrate court's* findings and conclusions of law that we review to ensure that they are supported by substantial and competence evidence. *See Simmons v. Loertscher*, __Idaho __, ___, 551 P.3d 719, ___ (2024) (quoting *Portfolio Recovery Assocs., LLC v. MacDonald*, 162 Idaho 228, 231, 395 P.3d 1261, 1264 (2017)). Relevant here, those findings were (1) that the male-only beneficiary restriction written into the Trust Agreement was a mistake, and (2) that the original intent of the Trustors was to benefit gender-neutral generations of the family, thereby leading to the conclusion that the elements for Trust reformation had been met. We hold that the 1978 Affidavit alone is substantial and competent evidence to support these findings. Accordingly, the district court's conclusion regarding the originations of the Trust's corpus is ultimately irrelevant to our review of the magistrate court's findings and conclusions.

In sum, substantial and competent evidence supports the magistrate court's findings that "a mistake occurred in the drafting of Article III of the Trust Agreement" and "[t]he Trustors did not intend to restrict the beneficiaries of the Trust to male members of the Terteling family but rather to provide that beneficiaries may be gender neutral so long as they are the children of or descendants of Joseph." Accordingly, the district court did not err in affirming the magistrate court's decision to grant reformation of the Trust.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court's decision affirming the magistrate court's grant of reformation of the Trust. As the prevailing party, the Petitioners are entitled to costs on appeal pursuant to Idaho Appellate Rule 40(a).


Chief Justice BEVAN, and Justices MOELLER, ZAHN and MEYER CONCUR.

16